USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: May 15, 2017

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X
                                                            :
                                                            :
                                                            :
IN RE: 650 FIFTH AVENUE AND                                 :
RELATED PROPERTIES                                          :
                                                            :
                                                            :
                                                            :
------------------------------------------------------------X

08 Civ. 10934 (KBF)
and all member and
related cases

<u>OPINION & ORDER</u>

KATHERINE B. FORREST, District Judge:

      This is a civil forfeiture action brought by the United States of America (the "Government") seeking forfeiture of properties and assets owned by Assa Company Ltd. and Assa Corporation (together, "Assa"),[1] the Alavi Foundation ("Alavi"), and their partnership the 650 Fifth Avenue Company ("650 Fifth Ave. Co." or the "Partnership") (together with Alavi, "Claimants").  The Government seeks forfeiture on the grounds that Claimants were controlled by or knowingly provided services to the Islamic Republic of Iran ("Iran"), that Claimants' properties and assets constitute or are traceable to proceeds of criminal activity, and/or that Claimants' properties and assets were involved in money-laundering transactions.

      The most significant asset as to which forfeiture is sought is a commercial building located at 650 Fifth Avenue in New York, New York (the "Building") owned by the Partnership in which Assa has a 40% interest and Alavi has a 60% interest. There have been assertions that the Building alone is valued at over a billion

---

[1] On September 16, 2013, the Court granted summary judgment with regard to claims against Assa (ECF No. 865); Assa did not appeal that decision.

dollars.  The Government intends to use any forfeiture proceeds obtained to satisfy judgments held by victims of terrorism (or their estates) perpetrated in whole or in part by Iran.

This action has been vigorously litigated for a number of years.[2]  Trial was previously set to commence on September 9, 2013.  On the eve of trial, the Court indicated that it intended to grant summary judgment to plaintiffs and adjourned the trial.  The Court issued its Opinion & Order on September 16, 2013.  (ECF No. 865.)  That decision was based primarily on two determinations: First, the Court determined that Assa was (and is) a front for the Government of Iran and violated the International Emergency Economic Powers Act ("IEEPA"), certain Iranian Transaction Regulations ("ITRs") issued by the U.S. Treasury banning the provision or export of services to Iran, and federal money-laundering statutes.  Second, the Court determined that Claimants also violated IEEPA and the ITRs because it was conceded that Claimants provided services to Assa.

The Second Circuit affirmed this Court's decision granting forfeiture of Assa's interest, but reversed and remanded with regard to certain other issues concerning Claimants.  See In re 650 Fifth Ave. & Related Properties, 830 F.3d 66 (2d Cir. 2016).  There is no dispute that Alavi is a charitable foundation established by the Government of Iran prior to the 1979 Iranian Revolution, the work of which

---

[2] Also before this Court are a number of private turnover actions brought by judgment creditors (the "Judgment Creditors") against the 650 Fifth Ave. Co., Alavi Foundation, Assa Corporation, and Assa Company Limited (the "private turnover actions").  Previously, the Court had coordinated all aspects of the private turnover actions and the forfeiture action.  At present, the cases remain coordinated for trial.

involves, <u>inter alia</u>, Muslim educational and religious activities. 650 Fifth Ave. Co. is a partnership that Alavi and Assa established contemporaneously with Assa's incorporation. Despite its name, 650 Fifth Ave. Co. is not a corporate entity but rather is a partnership organized under New York law.

Following the Second Circuit's decision, the issues remaining to be tried include whether Alavi—which, as has been established, knew at the time of its incorporation and for a period thereafter that Assa was controlled by Iran— maintained that knowledge subsequent to 1995.[3] In 1995, President Clinton issued a series of Executive Orders pursuant to the IEEPA formally declaring the Government of Iran a threat to national security and imposing broad financial sanctions. <u>See</u> Exec. Order No. 12,957, 60 Fed. Reg. 14615 (Mar. 15, 1995); Exec. Order No. 12,959, 60 Fed. Reg. 24757 (May 6, 1995). If Alavi had the requisite "post-1995 knowledge," the property and assets at issue may be subject to forfeiture;[4] if it did not, this case is at an end. A trial on the remaining liability issues is scheduled to commence on May 30, 2017.

In advance of that trial, certain pretrial motions must be resolved. The most significant is a motion by Claimants to suppress a large volume of documentary evidence obtained following the execution of a search warrant on December 19,

---

[3] As noted, this Court previously determined that there was no triable issue as to Assa being controlled by Iran and subject to forfeiture of its 40% interest in the Partnership.

[4] Alavi's knowledge is not the sole issue remaining. <u>See</u> <u>In re 650 Fifth Ave. & Related Properties</u>, 830 F.3d 66, 96-97 (2d Cir. 2016). Claimants have also asserted certain defenses, including the statute of limitations.

2008.  Commencing on March 17, 2017, and continuing over the course of four days, the Court held a suppression hearing.  Claimants have expended substantial resources on this motion; during the suppression hearing, Alavi and the 650 Fifth Ave. Co. were represented in the courtroom by more than eight, and at times as many as twelve, lawyers from two major law firms.  The Court heard from eight witnesses; received over ninety documents into evidence; and also received stipulations from the parties.  The evidence concerned, <u>inter alia</u>, the status of the investigation prior to December 2008, events leading up to the execution of the warrant, the search and seizures on the day of execution, and the continued review of seized materials thereafter.  While the Court reviews the facts relating to these events in some detail below, a summary is helpful at the outset.[5]

On December 19, 2008, agents from the Federal Bureau of Investigation ("FBI") obtained a warrant to search offices and a storage space located at 500 Fifth Avenue, New York, New York used by Alavi and the 650 Fifth Ave. Co.  The warrant was executed the same day.  As anticipated in advance, the premises searched had many documents responsive to the warrant, and ultimately several hundred boxes of records were seized.  In addition, and as provided for in the warrant, a number of computers were seized.  The seized materials were subsequently reviewed and it was determined that a substantial volume were either

---

[5] Many of the documents as to which Claimants seek an order of suppression were in fact produced by Claimants as civil discovery not only in the Government's civil forfeiture action, but also in the private turnover actions.  At the time the private turnover actions and the civil forfeiture action were set for trial in the summer of 2013, the same documents were marked by both the Government and the Judgment Creditors as trial exhibits.  The trials are proceeding in a materially similar coordinated manner on May 30, 2017.

not probative of the issues under investigation or could otherwise be returned to Claimants. Those records were returned on a rolling basis.

The Second Circuit has determined that the warrant issued on December 19, 2008, was constitutionally deficient insofar as it lacked particularity as to the crimes at issue. See In re 650 Fifth Ave., 830 F.3d at 99-101. Information relating to those crimes was contained in an affidavit presented to the issuing magistrate judge (the Honorable Theodore H. Katz), but that affidavit was not specifically incorporated by reference into the warrant itself. See id. at 101. This Court is now tasked with determining whether, given this constitutional deficiency, and in light of the totality of the circumstances, suppression is appropriate.

For the reasons set forth below, the Court concludes that suppression is not warranted. Indeed, suppression under the circumstances presented here would serve no significant salutary purpose but would prevent the use of obviously relevant evidence at trial.

I.   FINDINGS OF FACT

The Court makes the following findings of fact by a preponderance of the evidence.

A.   The Investigation of Alavi and Assa Prior to December 19, 2008

In 2006, Counter-Terrorism Squad 7 ("CT-7") in the FBI's Counterterrorism Division in New York opened an investigation of Alavi, Assa, and 650 Fifth Ave. Co. (March 2017 Suppression Hearing Transcript ("Tr.") at 24:23-25:20 (Ennis), ECF No. 1526.) In approximately the third quarter of 2006, Special Agent George Ennis

was assigned as case agent for the investigation. (Tr. 25:19-22 (Ennis).) He remained case agent until he was promoted in late 2009. (Id. 27:25-28:21 (Ennis).) Ennis testified live at the suppression hearing, and the Court found him credible and earnest.[6] The investigation involved possible criminal violations. Two Assistant U.S. Attorneys ("AUSAs") from the Criminal Division for the U.S. Attorney's Office for the Southern District of New York ("U.S. Attorney's Office"), Harry Chernoff and Eric Snyder, were assigned to work on the investigation. (Id. 354:1-6 (Chernoff).) Only in 2008 were AUSAs from the U.S. Attorney's Office's Asset Forfeiture Unit ("Forfeiture Unit") assigned to perform their review of the matter. (Id. 354:5-13 (Chernoff).)

The Court found Chernoff to be a highly credible witness. He was thoughtful and careful with his answers and displayed candor. Chernoff testified that among the possible crimes that were being investigated at the outset were violations of the IEEPA and a money-laundering conspiracy. (Id. 354:21-355:2 (Chernoff).) The money-laundering investigation concerned not only possible IEEPA violations (and a conspiracy to launder its proceeds) but also a tax conspiracy. (Id. 357:2-15 (Chernoff).) The IRS was also involved in the investigation as a result. (Id. 357:12-

---

[6] The Court notes that Ennis misremembered the order in which certain events relating to when the search warrant and affidavit were drafted in relation to when he learned that Alavi's president, Fashid Jahedi, had attempted to destroy documents sought by a grand jury subpoena. For instance, he initially testified that the search warrant resulted from learning about the destruction of documents by the head of the Alavi Foundation. As it turned out, while that fact certainly contributed to the urgency with which the search warrant was executed, drafting of the warrant and supporting affidavit had largely been completed when those events occurred. While the cross-examination was vigorous on these points and demonstrated faulty memory, it does not alter the Court's overall view as to Ennis's credibility.

14 (Chernoff.)  Chernoff testified that as part of this investigation into possible conspiracies, they were investigating acts in furtherance of a conspiracy outside of the date of the applicable statute.  (Id. 360:5-8 (Chernoff).)  This was particularly relevant to the conduct at issue in the violations of the IEEPA, which was only enacted in 1995; according to Chernoff, the criminal investigation involved events that predated 1995 in order support the conspiracy allegations.  (Id. 359:23-25 (Chernoff).)  As discussed below, Chernoff's testimony in this regard was corroborated by Ennis and the then-chief of the Forfeiture Unit, Sharon Cohen Levin.

As case agent, Ennis was responsible for all aspects of the investigation: administrative, tactical, and investigative.  (Id. 25:23-26:1 (Ennis).)  He was "in charge" of the case and had responsibility for the case file.  (Id. 25:24-26:3 (Ennis).)  In 2007, Special Agent George Alexander was assigned to act as his co-case agent.  (Id. 26:9-10, 26:24-27:2 (Ennis).)  A number of other agents from CT-7 as well as Counter-Terrorism Squad 9 ("CT-9") assisted in the investigation.  (See id. 27:11-21, 130:15-22 (Ennis).)

The investigation focused on the relationship between Alavi, Assa, and the Government of Iran.  This included the circumstances surrounding a 1989 transaction in which Alavi transferred its 100% interest in the Building, which was subject to a Bank Melli Iran mortgage, to the newly formed partnership between

Assa and Alavi, the "650 Fifth Ave. Company."[7]  Assa contributed over $40 million to 650 Fifth Ave. Co. and, in exchange, received a 35% interest (later modified to 40%) in 650 Fifth Ave. Co.  As part of this set of transactions, Bank Melli, which ultimately owned Assa, cancelled the mortgage it held on the Building.

Early in the 2006 investigation, the FBI obtained information and documents/records from a confidential source who had served as a board member of Alavi from 1982 to 1991.  (See Tr. 48:8-15, 147:7-22 (Ennis); Claimants' Exhibit ("CLX") D at 1.)  The source stated that Alavi was controlled by Iran and that it received revenue from a building located on Fifth Avenue in New York.  (See CLX D at 2.)  In the course of the investigation, agents also interviewed a number of witnesses.  Among these were Gholamreza Rahi, a former Bank Melli Iran official; Mohammad Dehghani Tafti, who at the time was Assa's sole officer, and Mohammad Geramian, who was Alavi's President from approximately 1992 until 2007.  (Tr. 49:20-55:10 (Ennis).)  In February 2008, as a result of a search warrant issued by the New York State Supreme Court, the FBI also obtained documents from a residence in Queens, New York that was owned by Bank Melli Iran.  (Id. 113:21-25, 128:2-9 (Ennis); see GX 9 ¶ 82.)

In the fall of 2008, the then-chief of the Terrorism and National Security Unit of the U.S. Attorney's Office discussed the investigation with AUSA Sharon Levin,

---

[7] Among the theories pursued in the investigation was whether money laundering occurred in connection with tax violations.  This theory was based upon events tracing back to 1989, when the partnership was formed.  (See Tr. 265:10-13 (Ennis).)

who was then chief of the Forfeiture Unit.[8]  (Id. 699:25-14, 700:4-5 (Levin).)  At this time, Levin had over fifteen years of experience as an AUSA in the Southern District of New York.  She became Chief of the Forfeiture Unit in 1996.  She testified live at the suppression hearing.  The Court found her highly credible and reliable, and she exhibited a natural and thoughtful demeanor.  The Court credits the entirety of her testimony and feels very comfortable placing great reliance on it.

Levin testified that, as of the time she was assigned to work on the forfeiture matter at issue here, there was a concern that funds held by Assa in the United States (which were generated from rental income from the Building) were at risk of being transferred overseas for the benefit of Bank Melli Iran.  (Id. 701:1-25.)  She testified credibly that after being familiarized with the investigation to date, she believed there was a basis to seize the funds from rental income generated by the Building at 650 Fifth Avenue as well as the Building itself.  (Id. 702:18-25, 703:1-6 (Levin).)  Levin knew that the criminal investigation was also continuing.  (Id. 705:13-15 (Levin).)

Thereafter, Levin and the Forfeiture Unit assisted in preparing an application for seizure of these accounts as proceeds of violations of the IEEPA and property involved in money-laundering transactions; the Forfeiture Unit also began exploring the possible forfeiture of the Building.  (Id. 701:1-703:13 (Levin).)  The seizure warrants were issued shortly thereafter, in late October 2008.  (See id.

---

[8] The Asset Forfeiture Unit was later renamed the Money Laundering and Asset Forfeiture Unit (they are referred to herein as the "Forfeiture Unit").

704:17-19 (Levin).)  Levin testified that this seizure started a "clock" at the U.S.

Attorney's Office and that they needed to file the civil forfeiture action within a

relatively short time thereafter.  (<u>Id.</u> 709:11-16 (Levin).)

Between 2006 and prior to the date on which the first civil forfeiture action

was filed (December 17, 2008), the investigation included interviews of confidential

sources; interviews with other witnesses; subpoenas and review of bank records;

phone records; physical surveillance; and consensual monitoring by the confidential

source.  (<u>Id.</u> 45:6-46:1 (Ennis).)  In addition, emails were obtained through the

District Attorney's office.  (<u>Id.</u> 45:19-24 (Ennis).)

According to Ennis, before the civil forfeiture complaint was filed on

December 17, 2008, the FBI concluded that both Assa and Alavi were controlled by

the Government of Iran.  (<u>Id.</u> 46:12-18 (Ennis).)  The FBI viewed Bank Melli Iran as

owning and controlling Assa, Alavi as aware that Bank Melli Iran owned and

controlled Assa, and Alavi itself as subject to the ultimate supervision and control of

the Government of Iran.  (<u>Id.</u> 49:20-55:10 (Ennis).)  Ennis and his team had also

developed information prior to December 2008 that supported two purposes of the

650 Fifth Ave. Co. partnership: to eliminate a tax burden, and to hide the fact that

both Alavi and its partner were controlled by the Government of Iran.  (<u>Id.</u> 47:3-11

(Ennis).)  Ennis also learned through his investigation (and prior to December 2008)

that the Alavi Foundation was a "wholly owned vehicle of the Government of Iran.

It was used to perpetuate its objectives on the United States."  (<u>Id.</u> 47:19-21

(Ennis).)  In addition, the control by the Government of Iran related to "all aspects

of any major decisions . . . any decision where funding was going to go, any decision on personnel, members of the board, or anything of import was all either ordered from Tehran or approved by Tehran." (Id. 47:25-48:5 (Ennis).) Ennis testified credibly that prior to December 2008, interviews with witnesses, physical records, as well as surveillance of members of the Alavi Foundation and officials from the Government of Iran supported these conclusions. (Id. 48:10-22 (Ennis).) In fact, Jahedi, Alavi's president, had been seen meeting with the Iranian Ambassador to the United Nations. (Id. 49:1-3 (Ennis).) Email traffic between members of the Alavi Board and the Iranian mission or Iranian Government further supported these conclusions. (Id. 49:4-8 (Ennis).) During interviews (the last of which occurred in the fall of 2008) with Muhammad Dehgavi Tafti, who was the sole employee and president of Assa, the FBI heard that Assa was controlled by the Government of Iran. (Id. 51:6-8 (Ennis).) Tafti informed the FBI that Assa was controlled by Bank Melli Iran and he knew that Bank Melli Iran was controlled by the Government of Iran. (Id. 52:7-11 (Ennis).)

Among the investigations the FBI had conducted after the investigation commenced in 2006 but prior to December 2008 was one of Muhammad Geramian. (Id. 52:12-18 (Ennis).)[9] Geramian had been a president of the Alavi Foundation for a substantial period of time. (Id. 52:19-25 (Ennis).) Ennis recalled that he may have been president until sometime in 2007 or 2008. (Id. 52:21-25 (Ennis).) During

---

[9] Geramian provided conflicting information over the course of his interviews. The Court credits Ennis's testimony that the FBI believed Geramian's first version of events to be the more accurate.

an initial interview, Geramian told the FBI that Alavi was controlled by the Government of Iran, and that all business decisions, personnel decisions, and financial transactions, were controlled by the Government of Iran. (Id. 53:7-17 (Ennis).) Another interview that also occurred after the investigation commenced in 2006 but prior to December 2008 was that of Rahi, the former head of Bank Melli New York. (Id. 54:25-55:1 (Ennis).) Rahi informed the FBI that Bank Melli Iran controlled Assa and also controlled the "entire partnership" between Alavi and Assa. (Id. 55:7-10 (Ennis).)

Ennis testified credibly that prior to the time the complaint was filed in December 2008, the FBI had already taken steps to obtain documents by way of subpoenas and discovery in the action filed against Assa. (Id. 58:21-23 (Ennis).)

Levin also testified credibly that not all of the information known as a result of the investigation was included in the complaint filed in December 2008. (Id. 706: 19-22 (Levin).) She testified that they did not want to publicly disclose certain details about Alavi's involvement. (Id. 706:23-707:19 (Levin).) At the suppression hearing, Levin explained that a conscious decision was made to exclude certain details about Alavi's involvement in the creation of 650 Fifth Ave. Co. and relationship with Iran from the Complaint. (Id. 706:19-707:19 (Levin).) Ennis confirmed that in his credible testimony. Ennis testified that the FBI and U.S. Attorney's Office wanted to continue their investigation using their confidential source and that they did not want to cut short any investigative opportunities that that might provide. (Id. 61:4-8 (Ennis).) According to Ennis, whom the Court

12

credited, if the information revealed by the confidential source was revealed in the affidavit supporting the search warrant or the complaint, the physical safety of the source and his family could be endangered.  (Id. 80:15-25, 82:18-21 (Ennis).)

Ennis further testified that, in all events, the final decision-making authority as to when to file a complaint against Alavi was with the U.S. Attorney's Office.  On behalf of that office, Levin testified credibly that a decision was made in an effort to proceed cautiously for a number of reasons: For example, there was a desire to coordinate with various Judgment Creditors who also might seek to assert an interest in Alavi's property; there was a desire to coordinate with the U.S. Treasury's Office of Foreign Asset Control ("OFAC"); the Forfeiture Unit was trying to work with AUSAs in the terrorism unit who were still engaging in a criminal investigation into Alavi; and there were sensitivities about bringing a forfeiture action against a New York charity.  (Id. 706:19-709-9; 712:13-713:22.)[10]

---

[10] Claimants allege that further information about Alavi was not included in the Complaint because the Government lacked sufficient evidence at the time to forfeit Alavi's interest in the Building.  (See Alavi Foundation and 650 Fifth Avenue Company's Post-Hearing Memorandum of Law in Support of Their Motion to Suppress ("Mem. in Supp.") at 5-6, ECF. No. 1574.)  The Court finds that this theory is not supported by the evidence in the record and presented at the suppression hearing.  The author of the email cited by Claimants that said there were "significant evidentiary and legal issues," Chernoff, testified live at the suppression hearing, and the Court found him credible.  (See CLX N.) He testified that in this email, the legal and evidentiary hurdles referred to seizures of assets in 25 different districts where property was located.  (Tr. 365:22-366:4 (Chernoff).)  He denied that there was insufficient evidence to bring a forfeiture action against Alavi as of December 17, 2008.  (Id. 366:8-17 (Chernoff).)  It is true that co-case agent George Alexander testified that it was the "view" of the "U.S. Attorney's Office" that they did not have enough evidence to proceed against Alavi at that time.  (Id. 566: 6-15 (Alexander).)  However, the Court does not rely on this testimony as competent evidence as to what the "view" of the U.S. Attorney's Office was at that time.  Alexander was an agent working with the FBI—he was not a lawyer, and certainly not an AUSA.  The Court credits the testimony of both Chernoff and Levin, along with the extensive evidence as discussed below as to what evidence in fact existed as of December 17, 2008, to support its finding that there was sufficient evidence as of that time.

As Levin explained, forfeiture of Alavi's interest in the Building was separated into a second litigation and later "phase." (Id. 707:20-708:4; 712:13-713:22; 740:14-741:8 (Levin).) Levin testified that nevertheless, in her opinion, there was sufficient evidence at the time of the filing of the complaint to also file a forfeiture action with respect to Alavi. (Id. 709:4-10; 735:4-736:1; 760:17-22 (Levin).)

1.     Complaint Against Assa

On December 17, 2008, the United States filed a Verified Complaint (the "Complaint) commencing an in rem action seeking forfeiture of, inter alia, "All right, title, and interest of Assa Corporation, Assa Company Limited, and Bank Melli Iran in 650 Fifth Avenue Company, including but not limited to the real property and appurtenances located at 650 Fifth Avenue, New York, New York, with all improvements and attachments thereon, and all property traceable thereto."[11] (ECF No. 1. ¶1(a).)[12] Levin explained that, under DOJ policy, the forfeiture proceeding had to follow shortly after the seizure of Assa's accounts. (Tr. 705:3-12 (Levin).)

---

[11] On December 24, 2008, one week after the Government filed its in rem forfeiture action, the Greenbaum judgment creditor group filed the first of the private turnover actions. (See Case No. 09-cv-553, ECF No. 1; see also Kirschenbaum v. 650 Fifth Ave. & Related Properties, 830 F.3d 107, 122 (2d Cir. 2016), cert. denied sub nom. Alavi Found. v. Kirschenbaum, 136 S. Ct. 1332 (Mar. 20, 2017).) The Greenbaum action named both Alavi and 650 Fifth Ave. Co., as well as Assa, as defendants. As to Alavi, it alleged, inter alia, that "[u]pon information and belief, Iran exercises day-to-day control over the operations of the [Alavi] Foundation by and through its president, Jahedi Farshid . . . ." (Case No. 09-cv-553, ECF No. 1 Ex. A ¶ 11.) The Greenbaum petition—as with the subsequently filed private turnover actions—seeks execution and turnover of Claimants' properties and assets pursuant to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605(a)(3) (2016), and § 201 of the Terrorism Risk Insurance Act of 2002 ("TRIA"), Pub. L. No. 107-297, 116 Stat. 2322 (2002).

The <u>in rem</u> civil forfeiture action asserted that the Claimants' assets and properties were "subject to seizure and forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C), as property constituting or derived from proceeds traceable to violations of the International Emergency Economic Powers Act ("IEEPA"), codified at 50 U.S.C. § 1701 <u>et seq.</u> [and were also subject to seizure and forfeiture] pursuant to 18 U.S.C. § 981(a)(1)(A), as property involved in or traceable to money laundering and attempted money laundering transactions, in violation of 18 U.S.C. §§ 1956 and 1957, and as property traceable to such property." (ECF No. 1 at ¶ 2.)

The Complaint outlined the alleged IEEPA violations as being based on the 1995 statutory provisions of the Iranian Transaction Regulations ("ITRs"), which "generally prohibit (1) the exportation, sale or supply, directly or indirectly, by a United States person or from the United States, of any goods, technology or services to Iran or the Government of Iran, and (2) the engagement by United States persons in any transaction or dealing, in or related to goods, technology or services, for exportation to Iran or the Government of Iran, without having first obtained a valid license from the United States Department of Treasury, Office of Foreign Asset Control ('OFAC')." (<u>Id.</u> ¶ 7.) According to the Complaint, Assa Corp. had been providing "numerous services to Bank Melli in contravention of the ITRs, including transferring rental income generated from the Fifth Avenue Company to Bank Melli, following Bank Melli's instructions with regards to Assa Corp.'s affairs, reporting back to Bank Melli on Assa Corp.'s financial situation and business dealings, and managing the affairs of Assa Corp. for the benefit of Bank Melli." (<u>Id.</u>

¶ 17.) The Complaint alleged that the organization of Assa, and the transfer of a 40% interest in the premises located at 650 Fifth Avenue, traced back to when the Building was first constructed by way of a loan from Bank Melli Iran to what was then the Pahlavi Foundation (and later became the Alavi Foundation). (Id. ¶¶ 18-24.) The history of that loan and its repayment by way of an ownership interest in a partnership organized for the explicit purpose of managing the Building are at the heart of the allegations.

Prior to filing of the Complaint, OFAC had been looking into designating Assa as a front for Bank Melli Iran. OFAC ultimately coordinated that designation (which was made simultaneously) with the filing of the Complaint on December 17, 2008. (See Tr. 705:24-706:5 (Levin).) Thus, the Court finds that had the Government chosen to proceed with a forfeiture action against Alavi in December 2008, it had ample factual support to do so.

2.    Protective Order

Alavi and 650 Fifth Ave. Co. were named in a Post-Complaint Protective Order (the "Protective Order") pursuant to 18 U.S.C. § 983(j)(1), entered by the Court on December 17, 2008, the same day that the Government filed the civil forfeiture Complaint against Assa and 650 Fifth Ave. Co. (ECF No. 2.) The Protective Order provided, inter alia:

2.    All persons and entities having actual knowledge of this Protective Order shall not, directly or indirectly, destroy any documents relating in any manner or part to the allegations in the Complaint, including but not limited to the books and records of the Fifth Avenue Company, the Pahlavi Foundation, the Mostazafan Foundation, the Alavi Foundation, Assa Company Ltd., and/or Bank Melli.

## Maintaining the Property

3.      The Management Company and the Fifth Avenue Company shall
maintain all books and records in their possession, custody and/or control,
that relate in any manner or part to the Fifth Avenue Company, the
Mostazafan Foundation, the Alavi Foundation, Assa Corporation, Assa
Company Ltd., Bank Melli and/or the allegations in the Complaint.

. . .

6.      The Fifth Avenue Company and the Management Company shall make
available for inspection to the United States, or its designee, the books and
records of the Fifth Avenue Company.

(Id. ¶¶ 2, 3, 6.)

The Court finds that the Protective Order required that the very same

records seized and determined relevant to this action be preserved.

### 3.      Events Leading up to the Search

On December 17, 2008—the same day the civil forfeiture Complaint was

filed—agents from the FBI and New York Police Department ("NYPD") conducted a

series of interviews with individuals employed by Assa, 650 Fifth Avenue, and the

Alavi Foundation.  Among the interviewing agents were Special Agent Jonathan C.

Scott and Detective Michael Esposito.  (GX 3.)  These interviews were conducted at

500 Fifth Avenue, where each of these entities shared offices and the same premises

that were searched on December 19, 2008.

Among those interviewed was President of the Alavi Foundation, Farshid

Jahedi, along with several others.  (GX 3; see also Tr. 57:23-58:3 (Ennis).)  In a

memorandum of the interview with Jahedi, the agent noted that when they

requested an interview, Jahedi called his lawyer.  Thereafter, he consented to

proceed with the interview. The memorandum noted that "[i]nitially, Jahedi advised that he did not know what Assa Corp. (Assa) was. After further questioning regarding its association with the Alavi Foundation of New York (AFNY), Jahedi stated that Assa held 40% of 650 Fifth Avenue (650). AFNY possessed 60% of the 650 real estate partnership." (GX 3 at FBI164121.) The memorandum further noted that "[a]ll of AFNY's incoming funds are received from 650. Incoming funds received from 650 are distributed 60% into AFNY and 40% into Assa. . . ." (Id. at FBI164122.) Jahedi explained that at some point in 2007 he withheld payments from Assa; then, he took funds owed to Assa and "reinvested" Assa's funds back into the 650 Fifth Avenue building. (Id.) He considered this a "loan" from Assa. (Id.) The memorandum noted that "Jahedi's experience in dealing with finances and budgets originated from his various employments in Iran. He was the Deputy President of Tehran University, formerly known as National University . . . . In Iran, Jahedi was also employed at the Remote Sensing Center (RSC), a United Nations backed program involving technology pertaining to satellite pictures of land. The RSC is no longer in existence." (Id. at FBI164123.)

During the interviews, agents saw a large volume of documents in the offices and, further, learned that there was a storage unit in the basement that contained two hundred or more boxes of records dating back thirty years. Based on the evidence developed at the suppression hearing, the Court finds that it was reasonable for the FBI agents to view both the current and historical materials as to

18

the nature of the relationship between Alavi, Assa, the Partnership, and Iran as probative regarding the crimes under investigation.

As the FBI was leaving 500 Fifth Avenue the afternoon of December 17, an agent served Jahedi with a grand jury subpoena directed to Alavi and relating to the FBI's ongoing and active criminal investigation into violations of IEEPA and two anti-money-laundering statutes. (See GX 3 at REV-FBI001953-1955.) The subpoena commanded that on December 30, 2008, Alavi produce "any and all documents relating or referring to" Assa Corporation, Assa Ltd., Bank Melli Iran, and 650 Fifth Ave. Co. from January 1, 1989 to the present. (Id.) The scope of the request included but was not limited to the following categories of documents:

>  a. Contracts and/or agreements relating to financial transactions of any type and kind, including sale, purchase, rental, management, lease or transfer of ownership;
>  b. Financial statements;
>  c. Deposit slips and deposit items to which the slips relate (front and back);
>  d. Cancelled checks;
>  e. Payment receipts;
>  f. Records of transfer of funds by wire, collection, or internal transfer (incoming and outgoing);
>  g. Correspondence, to include e-mails, faxes, etc.

(GX 6 at 3.) The Court finds that this subpoena materially covers the relevant documents seized two days later, on December 19, 2008.

The FBI placed a surveillance team on Jahedi after he had been served with the grand jury subpoena. (Tr. 64:17-20 (Ennis); GX 4.) The surveillance was instituted outside of the premises at 500 Fifth Avenue. (GX 4.)

While certain agents were surveilling Jahedi, Ennis was communicating with the U.S. Attorney's Office to prepare a search warrant of the premises. (See Tr. 369:9-13 (Chernoff).) Preparation of the search warrant and Ennis's accompanying affidavit began in the early afternoon of December 18, 2008. (Id.) The evidence at the suppression hearing amply supports probable cause for a search warrant of the premises as of that time. The FBI's investigation had revealed a strong basis to support probable cause for Alavi and 650 Fifth Ave. Co.'s participation in one or more crimes.

Later that afternoon, FBI agents followed Jahedi as he traveled by car to his home in Westchester. At one point, they observed Jahedi pulling into the Ardsley train station, exiting his car, and depositing torn documents into a public trash can. (GX 4.) Reconstruction of these documents indicated that they were among those required to be produced in response to the Alavi Subpoena; those documents separately happened to be covered by the Protective Order. (See GXs 4, 5; Tr. 515:21-24 (Alexander).)

Before Ennis learned of the destruction of documents, the search warrant was essentially complete. (Tr.372:4-10, 378:5-12 (Chernoff).) The AUSA working on the warrant and accompanying affidavit was Harry Chernoff. (Id.) In connection with his duties and responsibilities as an AUSA, Chernoff had already worked on

numerous warrants and supporting affidavits (none of which, to his knowledge, have resulted in suppression).[13]

Events moved quickly after the surveillance team saw Jahedi attempting to destroy documents. Ennis arrived at his office in Manhattan early on the morning of December 19, 2008. The search warrant and his affidavit were ready to be submitted to the Court. But the events of the prior evening added urgency to the matter and it was decided that the search would occur that day, and that Ennis would not be able to accompany team. Ennis was needed at the office to work with the AUSA to prepare a criminal complaint seeking Jahedi's arrest. Ennis executed his affidavit supporting the search warrant, it was presented to Judge Katz for signature early in the day, and the team was immediately ready to execute it thereafter.

Ennis also signed the criminal complaint against Jahedi (alleging obstruction of justice based upon his attempted destruction of documents sought by the grand jury subpoena) on December 19, and it was also presented to the Court and signed by Magistrate Judge Katz that same day. (GX 6.) The complaint detailed the events that had occurred the prior evening relating to the destruction of documents, and sought a warrant for Jahedi's arrest. (Id. at 4.) The need for a search warrant to issue before further documents could be destroyed, together with the need to draft a criminal complaint for Jahedi's arrest, required quick work by the

---

[13] In connection with his training as an AUSA (and in addition to his basic legal training), Chernoff received training in how to draft search warrants and supporting materials. (Tr. 380:16-381:9 (Chernoff).)

Government's attorneys on multiple fronts. The Court finds that the need for expeditiousness was the primary reason the search warrant was likely not identified as deficient prior to presentation to Magistrate Judge Katz.[14]

    B.    <u>The Warrant and Supporting Affidavit</u>

Ennis testified regarding the typical practices followed by FBI agents in the New York Office, and followed here, with regard to obtaining a search warrant. The Court credits this testimony. (Tr. 33:9-34:11 (Ennis).) In particular, the Court finds that the conduct here did not deviate in any material way from reasonable, typical practice.

Once a case agent and his team believe there is sufficient evidence to support probable cause for a search—that is, probable cause to believe a crime has been or is about to be committed—he would contact an AUSA assigned to the matter to discuss next steps. Ennis did that here. It is the practice in the New York Office for the AUSA to draft the actual warrant and the supporting affidavit, and that occurred here. Typically, and as occurred here, once a warrant and supporting affidavit are drafted for him, Ennis would review it and ensure accuracy. The warrant and affidavit are then typically, and as occurred here, approved by supervising counsel within the U.S. Attorney's Office. After the approval of the supervising attorney is obtained, the assigned AUSA and the agent—as occurred

---

[14] The Court is not suggesting that the "exigent circumstances" exception to the constitutional warrant requirement applies here. <u>See, e.g.</u>, <u>Kentucky v. King</u>, 563 U.S. 452 (2011); <u>Brigham City v. Stuart</u>, 547 U.S. 398 (2006). Rather, as a factual matter, the totality of circumstances under which the Government attorneys prepared the warrant application is relevant to good faith, and the circumstances here created a need for expeditiousness.

here—take the warrant and affidavit to a judge for review and approval. (See generally Tr. 33:3-36:25 (Ennis).)

The warrant and supporting affidavit of Ennis ("Ennis Aff.") were reviewed by a supervisor at the U.S Attorney's Office and presented to Magistrate Judge Katz on the morning of December 19, 2008. Magistrate Judge Katz reviewed and signed the warrant. Attached to the Ennis Affidavit as Exhibit B was the Verified Complaint, filed on December 17, 2008. That complaint consists of more than nineteen pages of factual allegations. (See GX 7.)

At the outset of his affidavit, Ennis set forth his qualifications: as of December 2008, he had been a Special Agent for seventeen years and for the past two years had been assigned to a "group that focuses on terrorism financing." (Ennis Aff. ¶ 1.)[15] His duties involved investigating material support of terrorism, money laundering, and violations of IEEPA. (Id.) As of December 19, 2008, Ennis had participated in executing approximately thirty search warrants. (Id.)

Paragraph 3 of his affidavit clearly identifies the crimes under investigation. (Id. ¶ 3.) Ennis stated that the seizure of items set forth in "Exhibit A," attached to his affidavit, were believed to "constitute evidence, fruits and/or instrumentalities of, among other crimes, violations of the International Emergency Economic Powers Act Title 50, United States Code, Sections 1701 through 1706, and Title 31, Code of Federal Regulations, Section 595 et. Seq., the money laundering statutes, Title 18,

---

[15] The Ennis Affidavit and its exhibits were admitted as GX 7; the affidavit and its exhibits can also be found at ECF No. 568-1.

§§ 1956 and 1957, and the mail fraud, wire fraud and related conspiracy statutes, Title 18, United States Code, sections 1341, 1343, and 1349." (<u>Id.</u>)

Ennis then summarized certain allegations set forth at some length in the Complaint, which had been filed two days previously. He stated that the "transactions underlying Bank Melli's acquisition of its interest in the Building" in 1989 was "not an arms-length transaction with Alavi, but rather a structure both to evade Alavi's tax liability and to conceal Bank Melli's interest in the Building." (<u>Id.</u> ¶ 5.) Based on this and other facts set forth in the Complaint, Ennis asserted that there was "probable cause to believe that Alavi committed the same crimes" as alleged in the Complaint, and that "Alavi and its directors, employees, and other agents, committed, conspired to commit, and aided and abetted the same violations by Alavi and Bank Melli, among others." (<u>Id.</u>) Ennis recited that Alavi maintains its offices at the Building, and the Building also housed files with respect to 650 Fifth Ave. Co. (<u>Id.</u> ¶ 6.)

Ennis recited that subsequent to the filing of the Complaint on December 17, 2008, he and other law enforcement agents had conducted a series of interviews with Alavi directors, personnel, and agents. (<u>Id.</u>) Among the interviews conducted as relevant to the investigation was one with the portfolio manager for the real estate company that manages the Building on behalf of the Partnership. (<u>Id.</u>) The portfolio manager indicated that a storage unit located at 500 Fifth Avenue contained historical files dating back approximately thirty years. (<u>Id.</u>) As of 2008, that meant that records might exist for the period when the allegedly non-arms-

length relationship between Alavi, Bank Melli Iran, and Assa began: 1978. This was a fact important to the investigation.

Ennis further explained that law enforcement had interviewed the president of Alavi, and that he had also stated that he possessed records of Alavi dating back thirty years. (Id. ¶ 7.) During the interview (which occurred at Alavi's offices at 500 Fifth Avenue), agents observed numerous file cabinets and other furniture that apparently contained files and records. (Id.) Based on his experience, Ennis stated that he believed the premises contained "extensive records and documents . . . that are of the kind listed in Exhibit A." (Id. ¶ 9.) Ennis further stated that "[t]hese records are likely to reveal important aspects and details of the crimes committed by Alavi and Assa Corp., among others, as well as the location of the substantial proceeds from these crimes." (Id.)

The final section of Ennis's affidavit discussed the importance of obtaining computers and electronic media. (See id. ¶¶ 11-12.) According to Ennis, "businesses involved in commercial rentals, investments, mortgages and real estate transactions routinely use computers and computer-related equipment." (Id. ¶ 11.) "Computers are typically used to communicate with other parties through e-mail, and to generate documents and recordings concerning leases, rent receipts, and other aspects of transactions with tenants." (Id.) Attached as Exhibit C to his

affidavit (and referred to in ¶ 12) were the "specific methods to be employed relating to the search of any computer-related equipment."[16]  (See id. ¶ 12, Ex. C.)

In sum, the affidavit describes the basis for the warrant as arising from information gathered during the course of an investigation into Alavi, Assa, and Bank Melli Iran.  (Id. ¶ 4.)  Bank Melli Iran was then and continues to be the Central Bank of Iran; it is an entity owned and controlled by the Iranian Government.  According to Ennis, the investigation concerned a 1989 transaction involving the Building, which was constructed with a loan made in the 1970s by Bank Melli Iran to a predecessor of Alavi.  (Id.)  Facts developed as part of the investigation indicated that in 1989, in order to avoid certain tax liabilities, Alavi repaid the loan by giving Bank Melli Iran a 40% interest in the Building through an off-shore entity (Assa) set up by Bank Melli Iran to receive and own that asset.  (Id.)

The affidavit did not include all of the information known to the FBI as of December 2008.  Ennis testified credibly that they did not want to include certain information because it could chill certain sources, and possibly endanger their welfare.  (See, e.g., Tr. 80:15-25; 81:17-18; 82:12-13; 82:25-83:4 (Ennis).)

---

[16] Exhibit C consists of four single-spaced pages describing a search protocol for electronic media as well as the reasons therefore.  (See Ennis Aff. Ex. C.)  The protocol describes the impracticability of an on-site search given the volume.  (See id. ¶ 1(c).)  In particular, data-storage capabilities at that time allowed the equivalent of as much as 7.5 million pages to reside on a computer's hard drive.  (Id.)  But in addition, off-site methods were needed to enable the search for concealed data.  (Id. ¶ 1(d).)  The evidence at the hearing was consistent with the agents following the protocol set forth in Exhibit C.

1.     Items to Be Seized

Exhibit A to the Ennis Affidavit sets forth the "Items to be Seized at the

Premises." It states:

1. Any and all documents, including contracts, memoranda of
   understanding, partnership agreements, incorporation documents, deeds,
   mortgages, loan documentation, rentals, leases, records of payments, e-
   mails, letters, memoranda or other documents or records concerning or
   relating to the ownership of, rental of, mortgaging of, or in vesting in the
   following entities:

   a. Assa Corporation
   b. Assa Company Limited
   c. 650 Fifth Avenue Company
   d. 650 Fifth Avenue, New York, New York
   e. Bank Melli Iran

2. Any and all documents concerning or relating to financial books and
   records, bank accounts, disbursements, money transfers or employment
   records of Assa Corporation; Assa Company Limited; 650 Fifth Avenue
   Company; Bank Melli Iran; the Alavi Foundation; or any of the officers or
   employees of these entities.

3. Any and all computers; central processing units; external and internal
   drives; external and internal storage equipment or media; computerized
   data storage devices; hard disks or floppy disks; CD-ROMs, hard disks,
   floppy disks; and related or connected computer or data storage
   equipment.

(Ennis Aff. Ex. A (footnote omitted).)

2.     Role of the Records Sought

Ennis testified that prior to December 19, 2008, the FBI's investigation

indicated that Assa did not have an office, but that its records were maintained at

500 Fifth Avenue, along with Alavi's and the 650 Fifth Ave. Co. partnership's

records. (Tr. 76:23-77:17 (Ennis), see also id. 234:11-17 (Ennis).) Hanieh

Safakamal, Alavi's former bookkeeper, also testified at the hearing; she was a

witness called by Claimants.  (Id. 284:19-332:17 (Safakamal).)  She similarly

testified that both Alavi and the 650 Fifth Avenue Partnership's documents were

located at the offices at 500 Fifth Avenue.  (Id. 287:25-288:2, 289:1-3, 290:19-23

(Safakamal).)

It is clear from the description of activities at issue in the Complaint and the

Ennis Affidavit that the relationship of Assa, Alavi, and their Partnership, the 650

Fifth Ave. Co., was at the heart of the FBI's investigation.[17]  Whether Alavi knew

that it was dealing with an entity owned and/or controlled, directly or indirectly, by

Iran was central to the alleged IEEPA and ITR violations.  In 1995, IEEPA and the

related ITRs made dealing with Iran in goods or services, directly or indirectly,

unlawful.  See 31 C.F.R. §§ 560.203, 560.204.  Of course, this raises the question of

whether any particular entity is Iran or an entity owned and/or controlled, directly

or indirectly, by Iran, or is acting on behalf of Iran.  See 31 C.F.R. § 560.304.  It is

plain that in the absence of an admission as to this element, this fact must be

proven.  Thus, to prove an IEEPA and ITR violation, the Government had the

burden of establishing that Assa was owned and/or controlled by Iran, and that

Alavi and the 650 Fifth Ave. Co. had (since 1995) been providing goods and/or

services, or otherwise transacting with Iran, directly or indirectly.  Evidence

supportive of Iran's involvement in the establishment of Assa is therefore a critical

predicate fact.  Proof of this would necessarily be based on an understanding of

---

[17] As stated elsewhere, this was also known to those involved in the investigation, as corroborated by
Ennis's testimony, among that of others.

what Alavi knew about Assa prior to 1995—when IEEPA and the ITRs went into effect.[18]  In other words, central to the alleged crimes giving rise to probable cause in the Ennis Affidavit for the search was an assertion that prior to 1995 and then continuing past 1995, Alavi knew that it was engaging in transactions with an entity owned and/or controlled by Iran.  Historical records tracing the relationships between the entities were thus directly probative of these alleged violations.

At the evidentiary suppression hearing, Alavi and 650 Fifth Ave. Co. spent significant time on questioning witnesses as to how records predating 1995 could possibly be relevant.  Repeatedly, counsel sought acknowledgement from witnesses that the IEEPA statutory scheme at issue was only effective as of 1995.  In their various submissions in support of its motion, Claimants point out that old records were gathered, and argue that this is supportive of an objectively unreasonable search.  This argument is without merit and fails to appreciate the Government's theory in its Complaint, filed in 2008 and incorporated by reference into the Ennis Affidavit submitted in connection with the warrant.

Ennis testified credibly at trial that prior to December 19, 2008, the FBI's investigation lead them to conclude that the entire timeframe—going back to the 1970s—would be probative of whether a crime had occurred.  (See, e.g., Tr. 78:10-24 (Ennis).)  Ennis testified that historical documents "would show the history of the control by the Government of Iran of the foundation prior to the partnership, how the government directed the foundation," and the instructions by the government as

---

[18] The ITRs were not effective until 1997, but were retroactive to 1995.  See 31 C.F.R. § 560.204.

to how the partnership was to be run.  (Id. 88:18-25-89:2 (Ennis).)  This was reasonable.

The financial books and records sought by paragraph 2 would show money transfers highly relevant to a money-laundering investigation.  (Id. 89:24-90:4 (Ennis).)  Employee records were necessary to trace the identity of witnesses as well as whether Iran was in fact making personnel decisions, as they had been told.  (Id. 90:9-19 (Ennis).)

In terms of computers and electronic media, Ennis testified credibly that in his experience, such media were merely different containers for the same type of information sought elsewhere on Attachment A.  (Id. 91:7-12 (Ennis).)

In addition, the Ennis Affidavit describes money laundering and financial transactions generally prohibited under IEEPA and the ITRs as among the transactions giving rise to probable cause.  The Ennis Affidavit and incorporated Complaint describe rents to commercial tenants in the Building as providing millions of dollars in income allegedly transferred to Iran.  Use of funds obtained by way of operations of the Partnership was thus potentially supportive of these assertions.

Levin similarly testified credibly that the formation of the 650 Fifth Avenue partnership was at the core of the case, along with the various relationships between Assa, Alavi, and Bank Melli Iran; as Bank Melli Iran had held the original mortgage on the building going back to the 1970s, and satisfaction of that mortgage

30

was a key event in the creation of the Partnership as well as the Assa entities, tracing that history was critical. (Id. 809:8-810:5 (Levin).)

In short, the Government's theory of their investigation of Alavi and 650 Fifth Ave. Co. fully supports the categories of documents sought. While those categories are certainly broad—seeking as they do "any and all documents"—there are instances when such breadth may be appropriate, and this was one of them.

At the suppression hearing, Ennis testified credibly as to the specific investigative purpose for each category of records sought. With regard to deeds, mortgages, loan documents, rentals, etc., Ennis testified that they would be relevant to the relationship between Assa, Alavi, and their Partnership. The partnership agreement would show the parameters of the relationship, and the mortgages and loan documentation would allow the FBI to better understand the receipt and flow of money; similarly rental receipts could show distributions between the partners. (Id. 87:11-20 (Ennis).) Emails and letters would also tend to show communications between these entities; records of payments could be expected to, again, show the flow of payments. (Id. 88:1-6 (Ennis).)

C.    Execution of the Search Warrant[19]

Ennis assembled the team that was to conduct the search. (Tr. 95:6-10 (Ennis).) He called the supervisor of CT-7 (and his supervisor), Ari Papadacos, and

---

[19] During the period prior to December 2008, the FBI assigned to the Southern District of New York received training on proper search procedures both at Quantico, as part of their initial training, and periodically there or elsewhere thereafter. (Tr. 29:3-25, 31:19-21, 32:5-6.) Included in this training were updates on case law and appropriate practices relating to search procedures. (Id. 29:23-25, 32:20-24, 33:3-5.) Part of that training includes the level of specificity needed in a search warrant. (Id. 35:5-8.)

made a number of additional telephone calls.  (Id. 95:12-20 (Ennis).)  The team that

executed the search is reflected on the sign-in sheet for the search team.  (GX 8.)

That sheet reflects the following participants in the search who had personal

knowledge of the Alavi investigation: Ari Papadacos, Jonathan Scott (an agent on

Ennis's squad, and one of the participants in the interview of Jahedi on December

17, 2008, (see GX 3)), Michelle Clark (who later married and now carries the last

name "Nicolet") (a Special Agent assigned to CT-7),  Summer Ives (an intelligence

analyst for CT-7), Pamela Brown (an intelligence analyst assigned to CT-9), Steve

Gonzalez, Dan McWilliams (who as assigned to CT-9 and working the case full

time), and George Alexander (the co-case agent).  (GX 8, Tr. 98:14-25; 99:1-25;

100:1-16 (Ennis).)  Ennis testified credibly that almost all of the individuals

involved in executing the search, as reflected in the sign-in sheet (GX 8), were either

assigned to CT-7 or CT-9 and had familiarity with the investigation.  (Tr. 100:17-21;

245:3-4 (Ennis).)  Special Agent Clark (Nicolet) who, as described below, was the

team leader for the search, also testified credibly that most members of the search

team were assigned to either CT-7 or CT-9.  (Id. 414:20-23 (Nicolet).)

Ennis testified credibly that he specifically recalled speaking with Papadacos

and Alexander, and possibly others, about the search before it commenced.  (Id.

101:12-15 (Ennis).)  Based upon the information he had, he expected that the search

team would gather a large volume of documents.  This was based on the nature of

the investigation, not a plan to "take everything."  He and others knew about the

interviews that had occurred on December 17, 2008, and that there was a

significant volume of material believed to be responsive in the offices and described as within the associated storage facility.

Prior to execution of any search warrant in the New York Office, an "operation plan" or "ops plan" is prepared. That occurred here. (Id. 39:14-21 (Ennis).) The ops plan discusses the details of how the search will be executed. (Id.) Generally, the case agent prepares the ops plan, and Ennis did so here. (See id. 39:22-23 (Ennis).) An "ops briefing" of the team that will participate in executing the search occurs thereafter. (Id. 40:22-41:5 (Ennis).)[20] An ops briefing includes review of the search warrant as well as an explanation of the evidence that the team will be looking for at the location. (Id. 41:6-14 (Ennis).)

 The team responsible for executing the search warrant at 500 Fifth Avenue participated in an ops briefing at approximately 10:30 a.m. on December 19, 2008. (Id. 415:18-25 (Nicolet).) The briefing included the members of the search team, almost all of whom, as stated above, were from one of two counter-terrorism squads, CT-7 and CT-9. (Id. 414:20-23 (Ennis).) At the briefing, the warrant was read and the agents assigned to execute the search were familiarized with what they would be searching for. (Id. 244:14-22 (Ennis), 415:6-21 (Nicolet).)

The search team leader for the search was Special Agent Michelle Clark (Nicolet), a lawyer and member of CT-7. (Id. 408:5-10; 411:14-20 (Nicolet).) Clark (Nicolet) had been assigned to CT-7 in 2008 and remained there until 2010. (Id.

---

[20] Ennis did not participate in the actual ops briefing, but he testified credibly that he received a report about it from others on the search team.

406:16-20 (Nicolet).)  She was chosen because she was assigned to CT-7 and had knowledge about the case.  (Id. 414:1-4 (Nicolet).)[21]

As of December 2008, Clark (Nicolet) understood that the investigation into Alavi and the 650 Fifth Ave. Co. concerned money laundering and potential IEEPA violations.  (Id. 410:7-14, 451:11-16 (Nicolet).)  Clark (Nicolet) had assisted in various elements of the investigation prior to the search and testified that she also had an increased knowledge of the substance of the case given that she was from the same squad as co-case agent Alexander and had participated in interviews of witnesses in connection with the case.  (Id. 410:22-411:4, 413:24-414:4 (Nicolet).)  In addition, she had personally participated in interviews relating to the case shortly prior to when the search warrant was executed.  (Id. 411:1-4 (Nicolet).)

The Court notes that it found Clark (Nicolet) highly credible based on her testimony at the live suppression hearing.[22]  Clark (Nicolet) answered the questions asked of her carefully and thoroughly.  Clark (Nicolet) testified that prior to the search on December 19, 2008, she had previously worked on ten to fifteen search

---

[21] Clark (Nicolet) testified that the personnel assigned to CT-7 had offices in a bullpen setup and that it was common to gain familiarity with the cases to which others in the squad were assigned.  She was quite familiar with the cases of the other special agents in CT-7 based on daily interactions.  (Id. 409:18-23 (Nicolet).)  The members of CT-7 also had meetings as a group from time to time; at these meetings the cases the members of the squad were working on would be discussed.  (Id. 410:1-3 (Nicolet).)

[22] Clark (Nicolet) is a trained lawyer.  She graduated from the University of Virginia School of Law in 2002 and practiced for two years in the litigation department of the law firm Willkie Farr & Gallagher LLP.  (Tr. 408:9-20. (Nicolet))  She has found her legal training helpful in her work as a special agent for the FBI.  (Id. 408:23-25 (Nicolet).)

warrant executions.  (Id. 411:5-8 (Nicolet).)  The Court found Clark (Nicolet) was highly knowledgeable with regard to the relevant issues.[23]

Prior to the search, Clark (Nicolet) reviewed the search warrant and Exhibit A thereto to familiarize herself with the types of items that were permissible for seizure.  (Id. 415:6-13 (Nicolet).)  These were also made available to the other members of the search team for their review prior to the search.  (Id. 415:15-25 (Nicolet).)  Clark (Nicolet) understood that the team expected to gather a high volume of documents.  (Id. 417:1-18 (Nicolet).)[24]  As part of her responsibilities as team leader she gathered supplies and paperwork for the search.  She brought copies of the search warrant and Attachment A with her so that she could consult them as needed during the search.  (Id. 418:17-419:3 (Nicolet).)

Clark (Nicolet) testified that the search warrant did not appear unusual to her—or different from other search warrants she had been involved in executing. (Id. 416:13-16 (Nicolet).)

Execution of the search itself began at approximately 12:17 p.m. on December 19, 2008.  Among others, the search team included four members of the evidence response team ("ERT").  (Id. 425:2-13 (Nicolet).)  ERT members receive extra training in searching techniques.  (Id. 425:16-19 (Nicolet).)  The search team also

---

[23] Clark (Nicolet) testified that she received training from the FBI policies and procedures for executing search warrants.  (Tr. 445:19-22 (Nicolet).)  She understood that in executing a search warrant the FBI could not engage in a general exploratory search and take whatever they wanted (Id. 446:19-22, 448:20-22 (Nicolet).)  She applied this knowledge here.

[24] Clark (Nicolet) noted that because the agents thought there were going to be a fairly high volume of documents, she prepared labels in advance of the search, which were necessary and would enable the search to be as efficient as possible.  (Tr. 418:1-16 (Nicolet).)

include members of the computer analysis response team ("CART").  (Id. 426:3-21 (Nicolet).)

After an initial walkthrough of the premises, entry photographs were taken to document the condition of the premises pre-search.  Clark (Nicolet) assigned individual members of the search team to particular areas and they began searching the premises.  (Id. 420:11-22 (Nicolet).)  During the search, Clark (Nicolet) answered questions about, inter alia, whether certain items fell within the parameters of Exhibit A to the warrant.  (Id. 421:21-4:22-1 (Nicolet).)  As described above, a number of individuals who were participating in the search had familiarity with the investigation.  During the search, Clark (Nicolet) was moving back and forth between the suite of offices and the storage space, answering any questions the searching agents might have.  (Id. 421:14-20 (Nicolet).)  Among the questions she was asked was whether a particular item fell within Attachment A or not. She was able to answer certain questions to determine based on the face of the Attachment; others required her to call on information she had gleaned based on her knowledge of the investigation.  (Id. 421:25-422:15 (Nicolet).)  In certain instances, she also consulted Ari Papadacos (the supervisor of the case agents Ennis and Alexander) or one of the case agents.  (Id. 422:11-15 (Nicolet).)  Not every item as to which a question arose was ultimately seized.  (Id. 422:16-21 (Nicolet).)

Clark (Nicolet) testified credibly that neither she nor anyone else instructed the search team to box up all records of whatever nature and take them.  (Id. 423:7-

14 (Nicolet).)  She believed that the team made reasonable efforts to seize documents that fell within the scope of the warrant.  (Id. 505:18-24 (Nicolet).)[25]

Clark (Nicolet) testified that when it came time to search Jahedi's office, she emphasized to the search team the need to be particularly vigilant about only taking documents that fell within the scope of the warrant.  (Id. 424:11-425:3 (Nicolet).)  She testified that she wanted to make sure that neither she nor other agents got swept up by the idea that everything has evidentiary value—and there was attention on maintaining vigilance as to the proper scope of the search.  (Id. 424:20-425:1 (Nicolet).)  The Court credits this testimony.

As they would finish searching one area, they would reallocate personnel to another area.  (Id. 421:18-20 (Nicolet).)  Before and after photographs taken of the main office suite area demonstrates that while many documents were taken, others were left behind.  (GXs 50-57.)  For instance, a comparison of GXs 50 and 50A demonstrates that certain items were left behind in the desk area of the entry; GXs 51 and 51A of an office space similarly shows the area before and after the search. GX 51A clearly shows a number of items remaining on the bookcase following the search.  Similarly, GXs 52 and 52A show that papers and other items were not seized.  The remaining photographs (to GX 57) similarly show materials not seized. (See generally Tr. 432:1-438:25 (Nicolet).)

---

[25] Case Agent Alexander joined the search while it was in progress.  (Tr. 517:19-21 (Alexander).)  He personally participated in the search of Safakamal's office.  He testified credibly that his search of her office conformed to his general practice of reviewing individual files and separating materials responsive to the search warrant from those that were non-responsive.  (Id. 519: 24-25, 520:1-6.)  As he reviewed documents in the office, certain items were seized and certain items were left behind. (Id. 520:13-16.)

During the search of the basement, the search team "spot-check[ed]" certain boxes that bore labels to ensure that the types of items inside the box were consistent with the label on the outside of the box and fell within the parameters of Exhibit A to the warrant.  (Id. 429:11-19 (Nicolet).)  Clark (Nicolet) explained that the basement was a fairly small space with a lot of items; the space was not suitable for on-site review.  (Id. 429:1-22; 486:4-11 (Nicolet).)  The Court finds that it would in fact have been impractical to review the documents within the storage space.[26] The storage space measured only fifteen feet by fifteen feet with many items and no work space.  (Tr. 429:3-10 (Nicolet).)  Clark (Nicolet) testified credibly that the team did not seize every item that was in the basement storage area.  (Id. 429:20-22 (Nicolet).)  This is corroborated by the before and after photographs of the area. (CLX AL.)

Similarly, Clark (Nicolet) testified credibly that it was impractical to search the computers on site.  (Tr. 427:1-25 (Nicolet).)  The Court finds that, as a matter of fact, this was correct.  This was because the volume of material expected to be maintained on the computer was prohibitively large for an on-site search, because different computers run different software and require specific tools, and because of the possibility that computers could be "booby trap[ped]" to destroy evidence if not handled properly.  (Id. 427:10-25 (Nicolet).)

---

[26] The practicalities were impacted by the fact that the search occurred on the day of a snow storm. (Tr. 106:24, 107:2 (Ennis).)

Ultimately, over 200 boxes of materials as well as multiple computers were taken from the premises.  (See id. 104:19-21 (Ennis); 475:4-7 (Nicolet).)[27]

When the evidence was brought back to the New York Office, it was secured in a controlled environment.  Ennis, Alexander, and McWilliams sorted through the documents.  (Id. 110:24-111:15 (Ennis).)  As non-responsive documents were identified, they were boxed up and returned to Alavi's offices on a rolling basis.  (Id. 112:9-16, 238:11-18, 239:6-9 (Ennis).)

A.  Special Agent (Ret.) Braziel

Claimants called former Special Agent Charlotte Braziel to testify live at the suppression hearing.  Braziel had been assigned to the FBI's Tampa Office for the majority of her career.  She was never assigned to the New York Office.  Claimants sought to qualify Braziel as "an expert in FBI procedures and protocols for obtaining and search warrants . . . [and] as an expert also in training for obtaining search warrants, FBI procedure for obtaining search warrants."  (Tr. 631:3-5; 634:5-9 (Braziel).)  The Government opposed Braziel's qualification as a general expert in this regard—and specifically with regard to whether her knowledge and experience were relevant to the FBI's practices in the New York Office.  The Court allowed Braziel to testify but reserved the question of whether it would qualify her as an

---

[27] The evidence at the suppression hearing indicated that certain documents protected by the attorney-client privilege were inadvertently seized.  The Court credits the testimony of the witnesses that there were no affirmative attempt to seize such materials but, as it turned out, certain such items were within the other materials taken.  The Court credits the testimony of case agent Alexander that when, during his subsequent review of seized documents, he identified a document potentially subject to the privilege, he would isolate it for the taint team.  The Court specifically finds that while this process was by no means perfect, it was conducted in good faith and according to practices within the district at the time.  (See, e.g., Tr. 525:14-527:15 (Alexander).)

expert.  (Id. 634:20-25 (Braziel).)  Having now heard from Braziel on both direct and cross examination, and having reviewed the documents the parties used with her during that examination, the Court concludes that while she certainly has extensive experience as a former Special Agent, including regarding the execution of search warrants, she lacks the particular expertise regarding the practices of the FBI in connection with its New York Office.  She also lacks the necessary level of expertise in connection with the type and size of investigations handled by the New York Office.  The Court therefore finds that she is not qualified to testify as an expert in this matter (though no doubt she may be qualified as an expert in other matters more directly related to her experience).  As Braziel is not a percipient witness—she lacks any firsthand knowledge of the facts in this matter at all—her testimony is therefore irrelevant to this proceeding.

The Court's view of Braziel was based upon a number of things.  First, Braziel testified clearly and forthrightly that her knowledge primarily concerns the FBI's practices and procedures at the Tampa, Florida division, where she worked during the entirety of her career.  (See Tr. 625:9-15 (Braziel).)  The size and particular procedures utilized in cases handled by the Tampa division often differed from those in the New York field office.  (See, e.g., id. 658:1-659:13; 660:4-15; 664:2-14 (Braziel).)[28]  Moreover, while Braziel purported to opine on the overbreadth of the search warrant in this case, and the variation of the search procedures used

_____

[28] In all events, Braziel acknowledged that she was involved in searches that were "pretty inclusive" and broadly sought all records of a company.  (See Tr. 678:25-679:4 (Braziel).)  She likewise acknowledged that reviewing the documents from a search could take years, as it had in certain searches that she had been involved with.  (Id. 681:11-14 (Braziel).)

here from those that she believed were more appropriate, the Government's cross-examination demonstrated that she had personally been involved in executing warrants in a manner not materially different from that here, and with a similar breadth of records seized.  (See, e.g., GXs 60, 64, 67, 68.)

In this regard, Braziel testified that she always recalled the statutory violations being investigated as included in the search warrants she executed, and that if one was not in the warrant, she would ask for it to be put in.  (Tr. 676:5-9 (Braziel).)  However, the evidence demonstrated that in the largest search in which she had been involved, of "Wellcare," that was not the case.  (GX 60; see also Tr. 677: 17-19 (Braziel).)  Similarly, she participated in a search of "Bane Medical Services" in which the warrant did not contain the statutes at issue in the warrant itself; she conceded that in such an instance she was comfortable because the affidavit had the necessary detail.  (GX 64.)  The statute at issue was also absent from the warrant of "Clearwater," another entity as to which Braziel participated in the search.  (Tr. 686:10-22 (Braziel).)  In none of the Wellcare, Bane or Clearwater warrants is the affidavit incorporated by reference.  (GXs 60, 64, 67.)

In addition, while Braziel testified that she found the items to be seized in the Alavi warrant to be excessively broad, she conceded that the Wellcare warrant essentially sought all records within a particular timeframe.  (Tr. 678:22-679:12 (Braziel).)  In addition, Braziel testified that ultimately over 700 items were taken during that search and reviewed over the course of the next two years.  (Id. 680:19-24 (Braziel).)  The subsequent review in fact entailed the work of 800 people in over

160 sessions.  (Id. 681:11-14 (Braziel).)  Braziel further testified that from time to time detail was included only in the affidavit supporting the warrant and not the warrant itself.  (Id. 683:15-22, 684:12-14 (Braziel).)  Braziel also conceded that it was appropriate to obtain information used to assist agents in the search from speaking with agents involved in the investigation.  (Id. 688:2-7 (Braziel).)

In sum, the Court does not find that Braziel is an expert in the FBI search practices applicable to the New York Office.  But, in any event, the Court finds that the Government's cross-examination revealed that in certain instances the search warrant and search practices she had utilized were not materially different from those she was criticizing here.

D. Amended Complaint Adding Claimants' Interests

In August or September of 2009, the U.S. Attorney's Office began preparing to amend the Complaint to add Claimants' interest in the Building.  (Tr. 727:2-5 (Levin).)  Ultimately, a Verified Amended Complaint (the "Amended Complaint"), seeking forfeiture of Alavi's and the 650 Fifth Ave. Co.'s property interests in the Building and certain other properties was filed on November 12, 2009.  (GX 9.)

In the time between when the Complaint and the Amended Complaint were filed, the FBI and U.S. Attorney's Office continued to develop its investigation against Alavi.  Ongoing investigation is common and, indeed, to be expected.   For instance, Levin testified that when the Complaint was filed, there were a large number of documents that the investigative team possessed from searches of the residence of the President of Bank Melli, and from the confidential source, but that

these had not yet analyzed.  (Tr. 728:4-16 (Levin).)  In addition, around the summer

of 2009, the team acquired funding that it previously lacked to utilize the services of

a Farsi translator to translate a number of documents—some of these documents

had been provided by the confidential source and many others had been acquired

from the search of the Bank Melli Iran residence.  (Id. 728:24-729:8 (Levin).)[29]

   As previously noted, Levin testified that there was sufficient evidence at the

time of the filing of the Complaint in 2008 to file a forfeiture action with respect to

Alavi's interests in the Building.  (Id. 709:4-10; 735:4-736:1; 760:17-22 (Levin).)[30]

She explained that from the outset, and based on evidence possessed prior to filing

of the Complaint, the premise of the case was that Alavi and Assa had knowingly

entered into the Partnership to conceal Bank Melli's interest and were violating

IEEPA by providing services to Iran.  (Id. 735:4-736:1 (Levin).)

   Levin acknowledged that the Amended Complaint contained some allegations

that referenced documents seized during the December 19, 2008 search of Alavi's

office.  (Id. 795:9-796:1 (Levin); see GX 9 ¶¶ 69-74.)  She confirmed, however, that

---

[29] Some of these documents that were translated were specifically referenced in the Amended
Complaint.  (Tr. 731:6-20 (Levin).)

[30] Counsel for Claimants questioned Levin regarding an email (GX 23; CX L) that she sent in
November 2008 to the head of the Asset Forfeiture, Money Laundering Unit for the Department of
Justice, stating: "With respect to the forfeiture, we believe that through the investigation we will
obtain sufficient probable cause to file on the entire building (we are at about 40 percent now)."  (Tr.
752:18-755:14 (Levin).)  Claimants have argued that this email supports that the Forfeiture Unit did
not have sufficient evidence to file a forfeiture action with respect to Alavi before the search and
seizure of Alavi's office at 500 Fifth Avenue.  Levin explained that while the email may have been
inartfully dratted, the Forfeiture Unit had sufficient evidence against Alavi at that time, (id. 764:1-
10 (Levin)), but that the evidence had not yet been fully reviewed and marshalled together as
presented in the Amended Complaint (id.; see also id. 736:2-737:6 (Levin).)  Levin further noted that
the investigation progressed between when she sent that email in November 2008 and when the
Amended Complaint was filed in December 2008.  (Id. 759:10-18 (Levin).)

43

much of the information discussed in such allegations (for example, a meeting between Jahedi and the Iranian Ambassador to the United Nations) was also contained in documents (such as journals from Alireza Ibrahimi) that the investigative team possessed prior to the search of Alavi's offices.  (Tr. 816:24-817:11 (Levin).)  Indeed, a substantial number of the allegations in the Amended Complaint referenced documents that the Government possessed when it seized Assa's accounts and filed the Complaint against Assa.  (See, e.g., GX 9 ¶¶ 28 (from a search of the Bank Melli president's residence prior to December 2008); 32 (received from a confidential source before December 2008); 33 (also received from the confidential source prior to December 2008); 34 (same); 35 (same); 36 (same); 37 (same); 38 (same); 39 (same); 40 (from a search of the Bank Melli Iran's president's residence prior to December 2008); 43-46 (based on documents also received before December 2008); 50 (from the confidential source before December 2008); 52 (same); 54 (same); 56 (same); 57 (same); 58 (same); 60 (same); 63 (same); 64 (learned from Rahi during an interview before December 2008); 77 (from surveillance before December 2008); 81 (learned from Geramian before December 2008); 82 (from a search of the Bank Melli Iran's president's residence before December 2008); 83-88 (same); 89-90 (learned from an interview of Geramian that occurred before December 2008); 96 (from a search of the Bank Melli Iran's president's residence before December 2008); see generally Tr. 113:9-130:11 (Ennis).) [31]  This testimony

---

[31] Claimants point to an email from Chernoff (the lead criminal AUSA) to Raskin, then Chief of the Terrorism Division of the U.S. Attorney's Office, as support for their argument that there were "significant evidentiary and legal" hurdles to bringing a claim then.  (CLX N.)  According to Claimants, it follows that the materials obtained as a result of the search were therefore necessary

by Ennis was consistent with that generally recalled by Levin. (Tr. 728:24-729:18 (Levin).)

E.    Preservation and Production of the Documents at Issue

Prior to the seizure, Claimants already had a legal obligation to preserve the records at issue. Immediately following the filing of the Complaint on December 17, 2008, the Government sought and received a protective order ("Protective Order"), requiring preservation of the very records here at issue.

On January 6, 2009, counsel for Alavi and the 650 Fifth Ave. Co., Daniel S. Ruzumna (who has remained as counsel to those entities to the present), wrote to counsel for the Government in the civil forfeiture litigation. In that letter, he stated: "I write to address certain production requirements set forth in the December 17, 2008 Post-Complaint Protective Order (the 'Protective Order')." (Jan. 6, 2009, Letter from Daniel S. Ruzumna, Esq., to AUSA Sharon Levin ("Ruzumna Jan. 2009 Letter"), Fornos Decl. Ex. 3.)

Ruzumna further stated, "[w]e understand the Fifth Avenue Company's obligations under the Protective Order and will produce any responsive documents and information, to the extent not already produced, as soon as we are able to do so." (Id.) The production to which he referred was the seizure that occurred in connection with the criminal investigation. (Id.) In essence, counsel acknowledged

---

to the filing of the complaint against Alavi. The Court finds that this argument is factually incorrect. Levin, Ennis, and Chernoff all testified credibly that there were no legal or evidentiary impediments to bringing a forfeiture claim against Alavi in December 2008. (Tr. 134: 20-25 (Ennis); id. 735:4-736:1 (Levin); id. 365:22-366:4 (Chernoff).) The fact that there was further investigation that could be done and would be done is far from equivalent to needing the information obtained pursuant to the search in order to be able to file a claim.

that the documents subject to the civil document production requirements in the forfeiture complaint that predated the December 19, 2008 search were a subset of those documents seized for the criminal investigation. In substance, he explicitly relied upon the seizure to fulfill his civil production obligations.

As the forfeiture and private turnover actions progressed, the Court coordinated the litigations for pretrial purposes. Following that coordination, on June 24, 2011, the Government and certain groups of the Judgment Creditors served a joint discovery request on Alavi and the 650 Fifth Ave. Co. (First Set of Consol. Doc. Requests to Claimants The Alavi Foundation and 650 Fifth Ave. Co., GX 10.) The discovery request represented that the document requests were being made "on behalf of [the Government] and the private plaintiffs in this consolidated action." (Id.)

On May 31 and June 28, 2012, Alavi produced a set of documents back to the Government and the Judgment Creditors in response to those requests—the Bates stamps on the documents produced simultaneously to the Government and Judgment Creditors on June 28 indicate that they include a subset of those seized in the December 2008 FBI search.[32] (See Letter of Krista D. Adler, Esq., to counsel, June 28, 2012, Fornos Decl. Ex. 22.) Alavi has not moved (nor could it) to suppress

---

[32] As stipulated by the parties, Government Exhibits 40-48 submitted in connection with the suppression hearing, "are true and correct copies of letters of email correspondence attached to documents produced by Claimants in response to the Government's document requests in this matter." (GX 70 ¶ 1.) These exhibits show that the following bates numbered documents were produced: ALV_00000001-00016962 (GX 40); ALV_00016963-0003896 (GX 41); SDNY-0000001-0733502 (GX 42); ALV_0038197-00045567 or SDNY-0011315-0404820 (GX 43); ALV_00045661-00046959 (GX 44); ALV_00046960-00062552 (GX 45); ALV_00045568-00045660 (GX 46); ALV_00062553-00062584 (GX 47); 5AVECO 00001-02162 (GX 48).

the documents at issue on this motion, which were provided to the Judgment Creditors.

More than a year passed between that June 2012 re-production of the documents and Claimants' initial assertion that the materials seized by the Government should be suppressed.

As of the filing of the Government's in rem forfeiture action on December 17, 2008 (if not sooner), Alavi also had common law obligations to preserve all of its relevant business records for production.  See Kronisch v. United States, 150 F.3d 112, 126 (2d Cir. 1998) ("[The] obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation—most commonly when suit has already been filed, providing the party responsible for the destruction with express notice, but also on occasion in other circumstances, as for example when a party should have known that the evidence may be relevant to future litigation."); Zubulake v. UBS Warburg LLC, 220 F.R.D. 212, 216 (S.D.N.Y. 2003).

The Protective Order of December 17, 2008, also required Alavi to permit the Government to inspect the entirety books and records of 650 Fifth Ave. Co. in connection with the forfeiture litigation.  (See ECF No. 2 ¶¶ 4, 6.)  Counsel for Alavi and 650 Fifth Ave. Co. acknowledged this obligation and complied by negotiating with the Government the return and re-production of the non-privileged documents seized in the criminal search.

As part of the suppression hearing in this matter, the parties stipulated that the documents referenced in GXs 40 to 48 were produced by Claimants in response

to the Government's document requests in this matter. (GX 70.) These exhibits specifically identify the documents produced by Claimants: Ex. 40 (May 31, 2012) refers to a production consisting of approximately 16,000 pages of documents. The cover letter states that it includes "documents located on the Foundation's electronic media, including on servers, computers, laptops, and discs." (GX 40.) Ex. 41 (June 21, 2012) refers to a production of an additional almost 20,000 pages. The cover letter states that it includes documents received from third parties, including in response to FOIA requests, as well as non-privileged documents contained in "our firm's files, such as documents relating to past litigations involving the Foundation and/or 650 Fifth Avenue." (GX 41.) GX 42 (June 28, 2012) refers to a production of approximately 70,000-plus pages. The cover letter states that "[t]his production includes our production from those documents provided to us by the Government in April 2012. We understand that many, but not all, of these documents were among those seized from the Alavi Foundation's offices on December 19, 2008 . . . ." (GX 42.) GX 43 (August 3, 2012) refers to a production consisting of approximately 8,000 additional pages. The cover letter accompanying this production indicates that they are non-privileged documents that were located in their litigation files. (GX 43.) GX 44 (May 27, 2013) refers to a production consisting of almost a thousand pages; GX 45 (May 31, 2013) refers to a production consisting of another approximately 18,000 pages; GX 46 (August 21, 2013) refers to a production of a little over a thousand pages, including documents in Farsi. GX 47 (March 28, 2017) refers to a production consisting of approximately fifty pages. The cover letter

states that "[t]hese documents were identified through a recent re-review of materials in preparation for trial, including materials returned by the FBI as potentially privileged . . . because we have been unable to confirm whether these documents were previously produced in this action, we are producing them now." (GX 47.)  GX 48 (January 16, 2009) refers to a production consisting of approximately 2,000 pages.  That letter further states, "most of the documents responsive to the Protective Order's demands are maintained by 650 Fifth Avenue's building manager, Jones Lang LaSalle ('JLL'), and we understand that JLL is providing these materials to the United States."  (GX 48.)  The letter continues, "[o]ther potentially responsive documents were seized during the FBI's December 19, 2008 search of the Alavi Foundation's offices.  Nevertheless, we are enclosing a disk containing certain responsive materials obtained by the Fifth Avenue Company from JLL . . . ."  (Id.)

II.    LEGAL STANDARDS RELATING TO SUPPRESSION

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV; Kentucky v. King, 563 U.S. 452, 459 (2011).  "It cannot be doubted that the Fourth Amendment's commands grew in large measure out of the colonists' experience with the writs of assistance and their memories of the general warrants formerly in use in England."  United States v. Chadwick, 433 U.S. 1, 7-8 (1977).

The search here at issue was conducted pursuant to a judicially authorized warrant. "The judicial warrant has a significant role to play in that it provides the detached scrutiny of a neutral magistrate, which is a more reliable safeguard against improper searches than the hurried judgment of a law enforcement officer 'engaged in the often competitive enterprise of ferreting out crime.'" Chadwick, 433 U.S. at 9 (quoting Johnson v. United States, 333 U.S. 10, 14 (1948).) Reasonable reliance on a judicially authorized warrant—even if that warrant is later held invalid—nevertheless constitutes good faith and suppression is not appropriate. See Davis v. United States, 564 U.S. 229, 240 ("[W]e have 'never applied' the exclusionary rule to suppress evidence obtained as a result of nonculpable, innocent police conduct." (quoting Herring v. United States, 555 U.S. 135, 144 (2009)).

"Our fundamental inquiry in considering Fourth Amendment issues is whether or not a search or seizure is reasonable under all the circumstances." Chadwick, 433 U.S. at 9.

A. The Exclusionary Rule

The exclusionary rule, providing for suppression of evidence obtained as a result of a constitutionally infirm search, is a judicial creation. Davis, 564 U.S. at 236. The rule provides for the exclusion of evidence "[w]hen the police exhibit deliberate, reckless, or grossly negligent disregard of Fourth Amendment rights." Davis, 564 U.S. at 240; see also United States v. Stokes, 733 F.3d 438, 443 (2d Cir. 2013). "'To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that

such deterrence is worth the price paid by the justice system.'" <u>United States v. Ganias</u>, 755 F.3d 125, 136 (2d Cir. 2014) (quoting <u>Herring</u>, 555 U.S. at 144.).

The exclusionary rule was applied by the Second Circuit in <u>Stokes</u> when the facts and circumstances revealed a "deliberate decision to violate constitutional requirements." <u>Stokes</u>, 733 F.3d at 443-44. There, an AUSA, Frank Chase, was twice asked by the ranking detective on the scene, and twice declined, to obtain a search warrant. Chase made a deliberate tactical choice not to obtain a warrant based on his desire to question the suspect outside of the presence of counsel; once a warrant issued, New York law would have prevented this. <u>Id.</u> at 444.[33]

Similarly and more recently, in <u>Ganias</u>, the Second Circuit applied the exclusionary rule when the Government had no basis for reviewing computer files obtained two and a half years earlier in connection with a prior, overbroad warrant, and apparently waited to see if the information in the files would one day prove useful. 755 F.3d at 137-38. The Court specifically found that "the benefits of deterrence in this case are great. With the Government's use of forensic mirror images becoming increasingly common, deterring its unconstitutional handling of non-responsive data has grown in importance. The substantial deterrence value in this case is clear when compared to <u>Davis</u>." <u>Id.</u> at 140.

---

[33] It appears that other facts were persuasive to the Court's analysis, including that a ruse was used to determine whether the suspect was in the room to be searched, that he was later acquitted of the more serious charges that led to the search in the first instance (leaving only a felon in possession charge, which depended entirely on the fruits of the warrantless search), and the fact that the Government attempted to rely on a factual affidavit from the manager of the motel premises searched obtained and submitted only after the evidentiary hearing on suppression had been concluded. <u>Stokes</u>, 733 F.3d at 441-43.

Exclusion is not, however, a personal constitutional right, "nor is it designed to 'redress the injury' occasioned by an unconstitutional search." Davis, 564 U.S. at 248 (quoting Stone v. Powell, 428 U.S. 465, 486 (1976)). As the Supreme Court noted in 2011, "The rule's sole purpose, we have repeatedly held, is to deter future Fourth Amendment violations." Id. (citing Herring, 555 U.S. at 141; United States v. Leon, 468 U.S. 897 (1984); Elkins v. United States, 364 U.S. 206, 217 (1960)). It is "a 'windfall' remedy to deter future Fourth Amendment violations." Davis, 564 U.S. at 248. The rule's operation is thus limited to "situations in which this purpose is 'most efficaciously served." Id. at 236 (quoting United States v. Calandra, 414 U.S. 338, 348 (1974)). "Where suppression fails to yield 'appreciable deterrence,' exclusion is 'clearly unwarranted.'" Id. (quoting United States v. Janis, 428 U.S. 433, 454 (1976)) (alternation omitted).

For exclusion to be appropriate, the deterrence benefits of suppression must outweigh the rule's heavy costs. Davis, 564 U.S. at 240 ("Police practices trigger the harsh sanction of exclusion only when they are deliberate enough to yield 'meaningful' deterrence, and culpable enough to be 'worth the price paid by the justice system.'" (quoting Herring, 555 U.S. at 144); see also Hudson v. Michigan, 547 U.S. 586, 591 (2006) ("The exclusionary rule generates 'substantial social costs.'") (quoting Leon, 468 U.S. at 907)). The Supreme Court has "rejected 'indiscriminate application' of the rule" and has "held it to be applicable only 'where its remedial objectives are thought most efficaciously served.'" Hudson, 547 U.S. at 591 (quoting Leon, 468 U.S. at 909, and Calandra, 414 U.S. at 348).

An example of deliberate action sought to be deterred by suppression occurred in <u>Stokes</u>. There, the Second Circuit deliberate action not to seek a search warrant taken as a result of a conscious tactical choice. Under such circumstances, exclusion was appropriate to deter similar conduct in the future. <u>Id.</u> at 444 ("We have no doubt that the exclusion of evidence is presumptively appropriate in such a clear case of illegal police action.")

B. <u>The Good-Faith Exception</u>[34]

The judicially created "good-faith exception" to the exclusionary rule recognizes the social costs of exclusion when law enforcement has acted in an objectively reasonable manner under the totality of the circumstances. <u>See</u> <u>Davis</u>, 564 U.S. at 248. This exception, first enunciated in <u>Leon</u>, provides that evidence seized by officers reasonably relying on a facially valid warrant issued by a "detached and neutral magistrate should not be suppressed." <u>United States v. Roberts</u>, 852 F.2d 671, 675 (2d Cir. 1988). The "pivotal question is whether 'a

---

[34] Claimants cite the district court's decision in <u>United States v. Zemylansky</u>, 945 F.Supp.2d 438 (S.D.N.Y. 2013), in support of their position that the good-faith exception is inapplicable here. Such reliance is misplaced. That decision focused on the failure to attach the affidavit supporting probable cause to the warrant itself. Here, the Second Circuit has already found constitutional infirmity on just such a basis. In <u>Zemylansky</u>, the district court found the good-faith exception was inapplicable in large part based on the fact that the officer who oversaw the execution of the search had not read the affidavit. <u>Id.</u> at 466. There were no facts suggesting that he had any particular familiarity with the investigation and therefore appears to have been left with an extremely broad warrant and no information to assist him in understanding the nature of the investigation. In contrast, here there is clear evidence that Clark (Nicolet) had significant information about the nature and scope of the investigation based upon her work in CT-7. She knew that the investigation concerned potential IEEPA violations and money laundering. Clark (Nicolet) was also a qualified lawyer. In addition, a significant number of agents who assisted in the search were also assigned to squads CT-7 and CT-9, both of which had been exposed to detailed information regarding the investigation. Thus, far from the situation in <u>Zemylansky</u>, the agents on site here knew what they were looking for and, importantly, why.

reasonably well-trained officer would have known that the search was illegal despite the magistrate's authorization.'" Id. (quoting Leon, 468 U.S. 922 n.23).

In Davis, the Supreme Court recognized that "[e]xpansive dicta" in several decisions implied that the exclusionary rule was a "self-executing mandate" implicit in the Fourth Amendment itself. 564 U.S. at 237. Certain cases seemed to "'treat[] identification of a Fourth Amendment violation as synonymous with application of the exclusionary rule.'" Id. (quoting Arizona v. Evans, 514 U.S. 1, 13 (1995). The Supreme Court reviewed the history and purposes of the exclusionary rule and its subsequent evolution. Id. It described Leon as a recalibration of "the cost-benefit analysis in exclusion cases to focus the inquiry on the 'flagrancy of the police misconduct' at issue." Davis, 564 U.S. at 238 (quoting Leon, 468 U.S. at 909). As the Court stated in Davis, when the police exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights, the benefits of exclusion tend to outweigh the costs. Id. at 238; see also Herring, 555 U.S. at 141. In contrast, when law enforcement acts with an objectively reasonable good-faith belief that their conduct is lawful, or when their conduct involves only simple, isolated negligence, the deterrent value of suppression is diminished and exclusion can't "pay its way." Davis, 564 U.S. at 238; Leon, 468 U.S. at 909, 919, 908 n.6.

Thus, "objectively reasonable reliance" on a later-invalidated warrant falls within the good-faith exception. Davis, 564 U.S. at 239; Leon, 468 U.S. at 922. "The error in such a case rests with the issuing magistrate, not the police officer, and 'punish[ing] the errors of judges" is not the office of the exclusionary rule.

<u>Davis</u>, 564 U.S. at 239 (quoting <u>Massachusetts v. Sheppard</u>, 468 U.S. 981, 990 (1984)). In <u>Davis</u>, the Supreme Court noted a number of varied circumstances that had been held to support application of the good-faith exception, including general instances of "isolated, non-recurring police negligence." <u>Id.</u> at 239 (internal quotation marks omitted). Such isolated, non-recurring negligence lacked the culpability required to "justify the harsh sanction of exclusion." <u>Id.</u> "Police practices trigger the harsh sanction of exclusion only when they are deliberate enough to yield meaningful deterrence, and culpable enough to be worth the price paid by the justice system." <u>Id.</u> (citing <u>Herring</u>, 555 U.S. at 144) (internal quotation marks omitted).[35]

Reasonable, good-faith reliance on a judicially authorized warrant has been upheld even when large-scale removal of materials from a premises has occurred. <u>United States v. Tamura</u>, 694 F.2d 591, 597 (2d Cir. 1982). In <u>Tamura</u>, the agents seized all records for the relevant time period and took large quantities of documents that were not described in the search warrant. <u>Id.</u> at 595. The Government argued that the seizure was reasonable as the records were intermingled. The defendant asserted that the FBI agents should have remained on the premises until they had extracted only the relevant materials. The Second Circuit found that while the search could have been conducted differently, suppression was not warranted. "Generally, the exclusionary rule does not require

---

[35]Judge Gleeson, now retired and counsel on this case, recognized the principle of good faith reliance in <u>United States v. Simmons</u>. No. 02-cr-314, 2003 WL 145261 (E.D.N.Y. Jan. 9, 2003). As he stated there, officers were justified in relying on a judicially authorized warrant—irrespective of whether the judge had been correct in authorizing it in the first instance. <u>Id.</u> at *10.

the suppression of evidence within the scope of a warrant simply because other items outside of the scope of the warrant were unlawfully taken as well." Id. at 596 (citing United States v. Daniels, 549 F.2d 665, 668 (9th Cir. 1977).)  The Court further found that because the Government's wholesale seizure was motivated by practicality rather than by a desire to engage in indiscriminate fishing, the officers had not "so abused the warrant's authority that it was transformed into a general one, requiring all fruits to be suppressed." Id.

Similarly, in United States v. Hargus, 128 F.3d 1358, 1362-63 (10th Cir. 1997), the court held that the seizure of items outside the scope of the warrant, such as office supplies, an answering machine, unopened mail, birthday cards, a tape measure, and life insurance policies, did not so grossly exceed the warrant as to require suppression.  There, the court found that the officers' conduct was motivated by the impracticality of on-site sorting and the time constraints of executing a daytime search warrant. Id.  The Second Circuit cited the Tenth Circuit's Hargus decision approvingly in affirming a district court's denial of suppression in United States v. Liu, 239 F.3d 138, 141-42 (2d Cir. 2000).  There, an IRS agent executing a search warrant spent thirty minutes spot-checking files in a file cabinet and determined that the level of responsiveness was substantial enough to warrant taking the entire contents of the cabinet without further on-site review. Id. at 141.  The Second Circuit found that "[t]hese actions bear none of the hallmarks of a general search: They suggest a fairly systematic inventory, not 'indiscriminate rummaging' and a search for items enumerated in the warrant[.]"

Id.  The court cited Hargus and stated that "even assuming arguendo that the INS

agents exceeded the bounds of the warrant when they seized individual agency files

without first searching them, we hold that appellants have not shown that the

agents' search resembled a general search."  Id. at 142; see also Andresen. v.

Maryland, 427 U.S. 463, 482 n.11 (1976) ("In searches for papers, it is certain that

some innocuous documents will be examined, at least cursorily, in order to

determine whether they are, in fact, among the papers authorized to be seized.

Similar dangers, of course, are present in executing a warrant for the 'seizure' of

telephone conversations.").

C. The Inevitable-Discovery Doctrine

"Under the 'inevitable discovery' doctrine, evidence obtained during the

course of an unreasonable search and seizure should not be excluded if the

government can prove that the evidence would have been obtained inevitably

without the constitutional violation."  In re 650 Fifth Avenue, 830 F.3d at 102

(citing United States v. Heath, 455 F.3d 52, 55 (2d Cir. 2006)) (emphasis added); see

also Stokes, 733 F.3d at 444 (The inevitable-discovery doctrine provides that the

"fruits of an illegal search and seizure are nevertheless admissible at trial 'if the

government can prove that the evidence would have been obtained inevitably

without the constitutional violation.'" (quoting Heath, 455 F.3d at 55)).  This

doctrine may be applicable in situations in which a search has been deemed

unreasonable for one of a number of potential reasons.  See, e.g., Heath, 455 F.3d at

55.  Put another way, that a court refers to this doctrine at all implies a

constitutionally deficient search. Id. ("In essence, the inevitable discovery

doctrine's application turns on a central question: Would the disputed evidence

inevitably have been found through legal means 'but for' the constitutional

violation? If the answer is 'yes', the evidence seized will not be excluded.")

To determine whether evidence would inevitably have been discovered, the

district court must examine the state of affairs "'as they existed at the instant

before the unlawful search" and determine what would have happened had the

unlawful search never occurred.'" In re 650 Fifth Ave., 830 F.3d at 102 (quoting

United States v. Eng, 971 F.2d 854, 861 (2d Cir. 1992) ("Eng I")) (emphasis in

original). In this regard, the court must first evaluate "'the progress of the

investigation at the time of the Government misconduct' to determine whether 'an

active and ongoing investigation . . . was in progress at the time of [the] unlawful

search.'" In re 650 Fifth Ave., 830 F.3d at 103 (quoting Eng I, 971 F.2d at 861-62,

and citing Eng II, 997 F.2d at 989-90). Next, for each particular piece of evidence,

the court must "'specifically analyze and explain how, if at all, discovery of that

piece of evidence would have been more likely than not inevitable absent the

[unlawful] search.'" Id. at 103 (quoting Eng I, 971 F.2d at 862, and citing Eng II,

997 F. 2d at 989-90) (alteration in original).

"[P]roof of inevitable discovery 'involves no speculative elements but focuses

on demonstrated historical facts capable of ready verification or impeachment and

does not require a departure from the usual burden of proof at suppression

hearings.'" Eng I, 971 F.2d at 859 (quoting Nix v. Williams, 467 U.S. 431, 444 n.5

(1984)) (emphasis in original); accord, Eng II, 997 F.2d at 990; see also Stokes, 733 F.3d at 444 ("The focus on demonstrated historical facts keeps speculation to a minimum . . . .")

The Government bears the burden of proving inevitable discovery by a preponderance of the evidence. In re 650 Fifth Ave., 830 F.3d at 102; Stokes, 733 F.3d at 444. The Government must "'prove that each event leading to the discovery of the evidence would have occurred with a sufficiently high degree of confidence for the district judge to conclude, by a preponderance of the evidence, that the evidence would inevitably have been discovered." In re 650 Fifth Ave., 830 F.3d at 102 (citing United States v. Vilar, 729 F.3d 62, 84 (2d Cir. 2013)). In Heath, and as reaffirmed in 650 Fifth Ave., the Second Circuit defined the Government's obligation in this regard as one of "certitude" that the evidence would have been discovered. Heath, 455 F.3d at 58 n.6; In re 650 Fifth Ave., 830 F.3d at 102. When a contingency may not have been resolved in the government's favor, a court should not find discovery would have been "inevitable." Stokes, 733 F.3d at 444; see also Roberts, 852 F.2d at 676. To support the inevitability of discovery, a court must find not only that a contingency "could" have happened, but that it "would" have happened. Stokes, 733 F.3d at 445. In Stokes, the court was persuaded that discovery was not inevitable when several contingencies depended on the actions of third parties who would have had several potential courses of conduct (for instance, the motel staff may or may not have found the bag of guns at issue; if the staff found the bag, they may or may not have reported it to the police; the defendant's

girlfriend may or may not have carried the bag out of the motel; Stokes may or may not have checked out when expected).  Id. at 447.  The Court concluded "that the sheer number of contingencies that may not have been resolved in the government's favor 'undermines the conclusion that the officers would have inevitably discovered the [evidence]." Id. at 448 (quoting United States v. Cabassa, 62 F.3d 470, 474 (2d Cir. 1995)).

The service of a subpoena seeking the same evidence as that at issue does not require a finding of inevitable discovery.  Roberts, 852 F.2d at 676.  In Roberts, the Second Circuit stated that "[t]he mere fact that the government serves a subpoena, however, does not mean that it will obtain the documents that it requests.  A subpoena can be invalid for any number of reasons, as when it is unduly burdensome . . . ." Id.  "Moreover, we can deplore but not ignore the possibility that the recipient of a subpoena may falsely claim to have lost or destroyed the documents called for, or may even deliberately conceal or destroy them after service of the subpoena." Id.  In Eng I, the Second Circuit clarified that Roberts did not stand for the proposition that the subpoena power could never be relied upon by the government to meet the inevitable discovery burden of proof.  971 F.2d at 860.  "The subpoena power conferred upon the government . . . serves important purposes as an investigative tool and as a method of obtaining evidence." Id.  It continued, a "per se prohibition" that subpoenas could never be relied upon "would conflict with the Supreme Court's requirement that the exclusionary rule, and the inevitable discovery exception, should not be employed so as to place the government in a

worse position that it would have been in had no unlawful search occurred." Id.
(citing Nix, 467 U.S. at 443-44). The Court analyzed its statements regarding
reliance on a subpoena in Roberts as based on the fact that the subpoena had been
outstanding for several months and did not appear to have prospects of producing
results. Id. at 860. "The circumstances revealed in Roberts which made it unlikely
that the subpoena would produce evidence, must be contrasted with a situation
where the government can demonstrate substantial and convincing basis for
believing that the requisite information would have been obtained by subpoena.
Where the government is able to make such a demonstration, there is no reason
why the government may not rely upon the subpoena power as one way it might
meet the burden of proving inevitable discovery by a preponderance of the
evidence." Id.

The Second Circuit's rulings in Eng I and Eng II are particularly instructive
regarding the principles governing inevitable discovery generally. In Eng I, the
Second Circuit stated the possibility that the government's investigation of the
matter in issue "was not sufficiently active or developed prior to the search of Eng's
safe to support the government's broad claims of inevitable discovery." 971 F.2d at
861. It noted that "[o]nly a few months passed from the beginning of [the
investigation] until the search of Eng's safe. Many important sources of evidence
were not sought out until after the search of Eng's safe . . . . The search of the safe
provided a great deal of specific financial information about Eng, and only
thereafter was the indictment amended . . . ." Id. The Second Circuit remanded the

case for more particularized findings by the district court as to the items of challenged evidence.  Id. at 862.

Following remand and the development of a more substantial evidentiary record by the district court, in Eng II the Second Circuit found that the disputed evidence would have inevitably been discovered during an ongoing tax-evasion investigation.  997 F. 2d at 993.  The Second Circuit pointed to the district court's factual finding that, at the time of the unlawful search, the government was involved in an ongoing investigation of Eng's narcotics violations, which "necessarily and customarily included an investigation of his finances in relation to the proceeds of the narcotics trade.  Such an inquiry would typically, and did in fact, lead to an investigation of Eng's tax returns." Id. at 990.  The Court noted that at an evidentiary suppression hearing, the district court received evidence regarding the status of the investigation and that it noted the "time span between the initiation of the investigation and the illegal search and the degree of investigative activity during that period (i.e. there were no subpoenas lying dormant for months prior to the search as in United States v. Roberts)." Id. at 991 (internal citations omitted).  Thus, the district court properly concluded that "the investigation was sufficiently active and advanced stage to compel the finding that alternate means of obtaining evidence were in existence and, at least, to some degree imminent, if yet unrealized and that the evidence produced by the investigation was simply the normal output of that investigation." Id. at 991 (internal quotation marks omitted).

In affirming the district court's decision, the Second Circuit stated that the facts as found by that court indicate that there was an active and ongoing investigation that would have necessarily involved the records at issue.  Id. at 991.  "Accordingly, the government was motivated to obtain additional evidence of Eng's narcotics activities and to see forfeiture of the proceeds derived from the distribution of heroin."  Id.  The Second Circuit found that because "the tax evasion investigation sufficiently was developed prior to the search of Eng's safe to support the government's inevitable discovery claim, we proceed to our second inquiry— whether the discovery of each piece of challenged evidence would have been more likely than not inevitable absent the search of Eng's safe."  Id. at 992 (internal quotation marks omitted).

The Second Circuit similarly upheld a finding of inevitable discovery on the basis that a subpoena would have resulted in disclosure of the challenged evidence in United States v. Vilar, 729 F.3d 62, 84 (2d Cir. 2013).  There, the Court referred to the district court's factual findings that (1) the subpoena was not issued based on information developed as a result of the search, (2) there was an active, ongoing investigation that would have led to a substantial search of the offices in any event, (3) the defendants' attorney would have raised the alternative of a grand jury subpoena, (4) the government would have issued the subpoena, and (5) the defendants would have produced the requested documents in response to the subpoena.  Id.  The Second Circuit found particularly persuasive the fact that production of the records at issue in response to a subpoena was precisely what in

fact happened—albeit after the challenged search had already occurred.  Id.  The Court noted, "[t]his case presents the unusual scenario where the actual events played out exactly as they would have 'but for' the overbreadth of the warrant, because the government actually obtained the evidence through alternative means that did not depend on the invalidity of the warrant."  Id.

### a.  Particularized Findings for Challenged Evidence

Part of the Government's burden in demonstrating inevitable discovery is not only that the general circumstances are supportive of such a finding, but that the specific items of challenged evidence would have been inevitably discovered.  See Eng II, 997 F.2d at 992-98 (reviewing particularized findings for categories of information such as Eng's personal bank accounts; records of those accounts; closing documents; payments for various types of bills discussed as a group; information regarding various properties; evidence disclosing the fact of a business; and general records relating to that business).

In Eng II, the Second Circuit affirmed the district court's factual findings that the specific items of challenged evidence would have inevitably been discovered.  It relied on the fact that information developed prior to the search (that Eng had bank accounts at certain financial institutions) logically connected to information obtained during the search (documents with the relevant account numbers).  The status of the investigation led to a conclusion that, one way or the other, the Government would inevitably have obtained such information even in the absence of the search.  Id. at 991-92.  In this regard, the fact that the subpoena

power was available supported the Government's position.  Id.  The Court reviewed

the district court's findings with regard to other challenged evidence and similarly

found that information already developed during the investigation would have

inevitably led to the discovery of such evidence.

D. <u>The Second Circuit's Instructions to This Court</u>

In its opinion dated July 20, 2016, the Second Circuit found that the warrant

underlying the December 18, 2008 search was constitutionally defective.  <u>In re 650</u>

<u>Fifth Ave.</u>, 830 F.3d at 99-100.  It further found that this Court's factual findings of

only a few paragraphs supporting inevitable discovery were insufficient.  <u>Id.</u> at 103.

In particular, it determined that this Court had not made sufficient findings as to

the state of the investigation as they existed the instant before the unlawful search,

and had also failed to make the necessary particularized findings as to what would

have happened had the unlawful search never occurred.  <u>Id.</u> (citing <u>Eng I</u>, 971 F.2d

at 861).  The Court noted that the Court's considerations in this regard should be

informed by (1) the initial civil forfeiture action, filed on December 17, 2008, which

sought forfeiture of only Assa's assets; (2) the district court's Protective Order,

issued in connection with that action and that required 650 Fifth Ave. Co. to make

available for inspection to the Government all of its books and records, and also

prohibited any person with knowledge of the Protective Order from destroying

documents relating to the complaint's allegations; (3) the grand jury subpoena

served on Alavi, and seeking all documents relating or referring to Assa, Bank Melli

Iran or 650 Fifth Ave. Co. for the period from 1989 to the date of production; and (4)

Jahedi's observed destruction of documents responsive to that subpoena the following day.  Id. at 103-04.

The Second Circuit also instructed the district court to consider whether (or not) the Government's investigation was sufficiently advanced prior to December 19, 2008, to make both Claimants' addition to the forfeiture action without the unlawfully seized evidence, inevitable.

Finally, the Second Circuit noted that the Government had argued, "with some force," that "whether or not the inevitable discovery exception applies, no suppression of evidence is warranted in this case because the executing agents relied in good faith on the December 19, 2008 search warrant."  Id. at 106 (citing Leon, 468 U.S. at 897.)  As the district court had not considered this argument in its prior decision, it was instructed to do so on remand (if the Government sought to pursue that argument).  Id.

III.    ANALYSIS

The Second Circuit has already determined that the warrant at issue in this matter was constitutionally defective.  In re 650 Fifth Ave., 830 F.3d at 99-100.  The question for this Court is whether by virtue of the good-faith exception to the exclusionary rule, inevitable discovery, the benefits (if any) to be obtained or lost as a result of suppression, or any other Fourth Amendment principles set forth in binding case law, the evidence obtained as a result of the December 19, 2008 search should be suppressed.  Based on the now-extensive factual record developed at the multi-day evidentiary hearing on this motion, the answer is certainly "no."

A. <u>The Good Faith Exception</u>

Based on the facts developed at the evidentiary hearing, this Court is confident, and has found as a factual matter, that the agents involved in the search of the premises at 500 Fifth Avenue, New York, N.Y., on December 19, 2008, acted in an objectively reasonable manner under the totality of the circumstances. As part of this, they acted in good-faith reliance on a judicially authorized warrant.

A number of facts the Court has found as set forth above are supportive of this conclusion.

First, of course, the warrant was drafted by the U.S. Attorney's Office according to established procedures. Nevertheless, the warrant was deficient. While the warrant lacked particularity as to the statutes, and the affidavit which had such information was not specifically incorporated by reference, nothing about the factual circumstances pursuant to which the warrant was drafted is suggestive of any intentional misconduct or deliberate action to violate the law in that regard. Rather, the circumstances indicate that failure to include particularity as to the crimes was plainly an oversight. For instance, the warrant that had previously been used to search the premises of the residence of the president of Bank Melli Iran did contain the requisite specificity.

Second, while the assigned AUSA had begun to work on the warrant by mid-day on December 18, 2008, and had materially completed his work on the warrant and the supporting affidavit before he or Ennis learned of Jahedi's attempted destruction of documents, the Court finds that this event nonetheless played some

role in why the deficiencies in the warrant were not caught. In this regard, the Court notes that following the attempted destruction of documents, there was new urgency to the execution of the warrant early on December 19, 2008, and attention was further distracted by efforts expended by the AUSAs and Ennis to draft and present to the district court a criminal complaint against Jahedi, seeking his arrest. Based on this evidence, the Court finds that it is more likely than not that as a result of these events, the AUSA who had previously demonstrated the legal expertise to present a constitutionally satisfactory warrant did not properly review and edit the warrant. Certainly these other events made the matter more urgent and required additional effort on an entirely unanticipated document (the criminal complaint). In sum, these circumstances support that this was oversight and not deliberate action.

Third, the preparation for and execution of the search itself demonstrate that the agents acted in an objectively reasonable manner. The warrant, drafted by the AUSAs working on the investigation, was presented to Magistrate Judge Katz. Magistrate Judge Katz approved the warrant, and the agents relied upon his approval. The Ennis affidavit was attached to the warrant approved by Magistrate Judge Katz. As discussed above, that affidavit described in detail the basis for probable cause as to Alavi. But in addition, an exhibit to his affidavit was the then-filed in rem forfeiture Complaint as to Assa's interest in the 650 Fifth Avenue Partnership and the Building. Had those supporting materials been specifically incorporated by reference, the lack of particularity as to crimes under investigation

would no longer exist.  In any event, the Judge duly signed the warrant.  Based, then, upon a judicially authorized warrant, the agents proceeded to execute the search.

Fourth, the above facts make clear that the procedures used to execute the warrant were entirely typical and objectively reasonable.  Ennis testified that the typical procedures to gather a team to conduct the search and prepare for the search were utilized here—albeit in an expedited manner.  By the time that he was gathering the search team together, he was aware that Jahedi had attempted to destroy documents and there was increased urgency.  Nonetheless, typical protocols were followed.  The fact that typical protocols were followed in powerful evidence supporting good faith and the objective reasonableness of the search.  There is no credible evidence that this search was treated in any manner that was out of the ordinary or akin to an exploratory search.

Initially, Ennis, who could not himself be present at the search, consulted with his supervisor, Papadacos.  Papadacos had knowledge of the investigation.  Ennis then made a series of telephone calls to gather together agents who could conduct the search.  The assigned lead was Special Agent Clark (Nicolet).  Clark (Nicolet) also had personal familiarity with the investigation.  She had, in fact, participated in interviews of witnesses for the investigation shortly before the warrant was executed.  A substantial number of the other agents were on either CT-7 or CT-9 and also had pre-existing familiarity with the investigation.  One of the agents, Special Agent Scott, had drafted the FBI's 302 relating to the December

17, 2008 interview of Jahedi. The Court's conclusion that the agents conducted the search in an objectively reasonable manner is also based on the fact that many members of the search team had prior familiarity with the investigation. As described above, a substantial number of the search team therefore already—and separately and apart from the warrant—understood the nature and scope of the investigation. The agents' familiarity with the investigation was confirmed by the testimony of Ennis and Clark (Nicolet) and by documentary evidence.

In addition, Clark (Nicolet) who was the assigned lead for the search, had no reason to proceed in anything other than a professional and appropriate manner. She was an impressive and highly credible witness who has been given increasing and important responsibilities over the years. No evidence in the record supports any reason she would have had to cut corners. Clark (Nicolet) testified that had been trained as an FBI agent in search procedures; this was similar to the training that Ennis testified credibly that all agents received. Clark (Nicolet) was also a trained lawyer from a prestigious law school and had practiced as a litigator at a national firm. In short, she had the experience and training to perform a search in a reasonable manner. The evidence does not support any material deviation from typical procedures.

But in addition, Clark (Nicolet) testified credibly that she had personal familiarity with the investigation itself. She had, in fact, participated in interviews just prior to the execution of the search warrant. She was familiar with the crimes that were being investigated and the type of evidence supportive of those charges.

Clark (Nicolet) also testified that she understood—before the team even began the search—that they expected the search to result in a substantial seizure of documents. The evidentiary records reflects that this expectation was based upon the nature of the records relevant to the money laundering and IEEPA crimes under investigation. In addition, interviews at the premises to be searched on December 17 had revealed an office full of hard-copy documents and a storage room with documents going back thirty years that were likely probative of the alleged crimes. Thus, the fact that a large number of records were seized is not probative of an unreasonable seizure; it is, here, indicative of a significant investigation.

Clark (Nicolet) prepared appropriately for the search, gathering supplies and the team that would conduct the search. The team reviewed the warrant and made sure that they all understood what they would be searching for. Far from being prepared to conduct an exploratory, general search, the team was prepared to specifically execute the warrant.

The procedures that were utilized during the search itself further confirm the objective reasonableness of the agents' behavior. To start, the agents duly signed in and noted their presence on the sign-in sheet. In addition, a record was kept of which agents were involved in searching which room, and an inventory of boxes for each room was maintained. "Before" photographs were taken of each area in the premises that subject to search. Members of ERT and the CART teams were present to insure that all additional procedures relevant to gathering evidence generally and computers specifically were followed.

As the search proceeded, far from abandoning the agents to conduct a random gathering of all and sundry documents, Clark (Nicolet) ensured that she canvassed the premises, answering questions as needed regarding the scope of the search. The fact that she was asked questions regarding responsiveness corroborates that selections were being made. Clark (Nicolet) testified credibly that she herself ensured that the contents of boxes matched their external labels.

The photographs taken after the search confirm that documents were left behind. Contrary to Claimants' assert, not "everything" was taken. Rather, the Court finds that the Government, assisted by Clark (Nicolet), made selections of documents.[36]

Clark (Nicolet) testified credibly that under the circumstances, and given the volume of documents at issue and the need for special expertise with regard to the computers, the documents and computers were boxed up for further review at the FBI's offices. This was neither unusual nor in and of itself objectively unreasonable. There is no doubt that the volume of documents expected to be gathered was large; and the documents in fact gathered met those expectations. Unless the FBI was going to prevent the Alavi Foundation from conducting any business the following week, they needed to conduct their review elsewhere. This review process also understandably took some time given the volume. But that fact was also not shown

---

[36] Claimants' argument that the search was in fact an exploratory search is based largely on the number of boxes eventually returned. The fact that boxes – even many – were returned does not mean that they were not appropriately gathered by agents conducting the search in good faith and in an objectively reasonable manner. The agents were relying on a judicially authorized warrant – that they ended up selecting documents based on that warrant that were not later necessary to the investigation does not indicate an unreasonable search.

to be unusual.  In short, the evidentiary record supported the review process as consistent with normal practice.  In short, the agents were not acting in some sort of deliberate, reckless, or grossly negligent manner.

Claimants point to the breadth of the categories of records set forth in Attachment A as supporting some sort of incurable unreasonableness.  Based on the facts as found by the Court here, this argument is misguided.  It is certainly true that the categories of records sought were broad.  But Ennis and Levin both testified credibly as to the purpose of both particular types of documents, and the specific need for historical documents.  (The Court has specifically discussed that relevance above).  Contrary to Claimants' assertion, on the particular facts here, to prove the crimes under investigation relating to money laundering or IEEPA violations of the type required information concerning historical relationships.  Among the issues in the criminal investigation and now in the civil forfeiture case is whether the Alavi Foundation, at some point in its history, took affirmative steps to try and hide its relationship with Iran, whether Iran directed activities including charitable funding decisions, personnel decisions, and general operations.  Proving that relationship could require access to personnel documents (to show, as Ennis testified he had heard from a confidential source, that Iran in fact controlled such decisions); Ennis testified that information developed during the course of the investigation indicated that Iran also participated in funding decisions by the charitable foundation—rendering those documents potentially direct evidence of the matters under investigation.  In addition, the money laundering and provision of

service issues required detailed proof as to the nature of the rent receipts and money flows.  This included tenant-related documents as well as extensive bank records.  In short, and as more fully described above, there is no doubt that the documents that were probative of the crimes under investigation were potentially and in fact large in volume.  Accordingly, given the particular circumstances here, the mere recitation of "200 boxes were taken" does not demonstrate an unreasonable search.  The facts demonstrate that, to the contrary, the search categories were reasonable.

The facts and circumstances of this search demonstrate that it was conducted in good faith, in reliance upon a duly authorized warrant, and in an objectively reasonable manner.

B. <u>Application of the Exclusionary Rule Serves No Significant Salutary Purpose Here</u>

Even if this Court concluded that the search had not been conducted in an objectively reasonable manner, it would nonetheless also conclude that this is not an instance in which the exclusionary rule should apply.  <u>See</u> <u>Davis</u>, 564 U.S. at 240.  The facts do not support the type of deliberate and culpable conduct that suggests exclusion would be appropriate.  Here, as described now at length above, the U.S. Attorney's Office and FBI used routine procedures in connection with a very large investigation.  The facts and circumstances demonstrate that normal procedures were used to obtain a judicially authorized warrant—though there was a deficiency on its face.  That deficiency seems, by all accounts, to have been an oversight.  There was no advantage to be gained from not including the particular

74

statutes under investigation on the face of the warrant. That was especially so in light of the fact that a civil forfeiture action had only two days before been filed against Assa and its interests in the 650 Fifth Ave. Co., making the theories public. Thus, there was and could not have been anything strategic about failing to disclose the statutes at issue.

The search itself was also conducted in an objectively reasonable manner (as discussed above). Any deficiencies were the result of oversight. There is simply no evidence of conscious, reckless, or grossly negligent decision making.

Claimants' main issue has always been focused on the volume taken and then returned as non-responsive. Both of these facts are true—but the facts discussed above explain how the categories were relevant, how the search proceeded, and that in fact selections were made. In addition, the return of documents demonstrates that the Government was not seeking to declare documents probative of the investigation just for the sake of it. Indeed, the return of documents on a rolling basis cuts against a finding that the Government engaged in deliberate or grossly negligent conduct.

As set out at some length above, there is now a substantial body of case law that instructs courts to consider whether exclusion is warranted even in the face of a constitutionally infirm warrant and objectively unreasonable conduct. See, e.g., Davis, 564 U.S. at 241; Leon, 468 U.S. at 922. Here it plainly is not. The search here was in the context of an investigation relating to a relatively unusual set of circumstances. Given these circumstances, exclusion here would serve no

significant deterrent purpose. This Court is hard pressed to find any significant remedial purpose that would be served by exclusion here; against this, the cost of exclusion would be high. This is especially so since the same documents at issue on this motion have been provided to Judgment Creditors through the normal discovery process in the <u>Kirschenbaum</u> and related actions. Thus, exclusion here would deprive the jury of documents relevant to its decision, but not remove the very same documents from other civil actions pending before the Court.

C. <u>The Specific Evidence at Issue Would Have Been Inevitably Discovered</u>

The facts as the Court has found them above also support inevitable disclosure of specific items of evidence. The legal standard governing inevitable discovery requires first, that this Court analyze what the status of the investigation was prior to the unlawful search.

Here, the facts demonstrate that the investigation was very active, with a number of interviews occurring prior to the search, extensive use of a cooperating human source who provided detailed information as well as documents, and the execution of a search warrant at the residence of the president of Bank Melli Iran. These facts are confirmed by the 302's introduced into evidence at the evidentiary hearing on this motion, by a copy of the search warrant for the Bank Melli Iran residence, and the credible testimony of Ennis and Levin.

The facts developed in detail at the evidentiary hearing allow this Court to easily conclude that prior to the search, a majority of the facts that were later included in the complaint against Alavi's interest (the November 2009 "Amended

Complaint"), had already been developed. Tactical and strategic decisions were made (and the Court credits the testimony in this regard) not to include them in the complaint against Assa's interest due to (1) concerns about the safety of a cooperating witness, (2) concerns about chilling a human source, (3) concerns about suing a New York charity, and (4) concerns about proceeding in coordination with counsel for the victims of terrorism holding judgments against Iran, and their families or estates. The investigation was at an advanced stage before the search occurred.

Based on this status, it was inevitable that the Forfeiture Unit of the U.S. Attorney's Office would seek to forfeit Alavi's interest. As Levin credibly testified, it was highly unusual in the first instance to proceed as they had—against only a 40% interest at first. That was done for the reasons already stated as well as policies of the U.S. Attorney's Office regarding following actions against funds with forfeiture actions. But in addition, the Court has found that the facts necessary to support the claim against Alavi were already present.

Joining Alavi's interest in the litigation would have allowed the U.S. Attorney's Office to have used civil discovery devices. This Court has a factually based, high level of confidence that this would have occurred.

But in addition, other processes were already in motion. As in <u>Vilar</u>, a subpoena for the same documents as those at issue had already been served. That was the grand jury subpoena served on Jahedi in December 17, 2008. This subpoena was being actively monitored and pursued, as was evident from the

77

surveillance team placed on Jahedi following service of the subpoena, and the quick, reactive action when he attempted to destroy relevant and responsive documents that same day. These acts make it clear that this subpoena was in fact being vigorously pursued.

In addition, this Court can also say with near certainty that the documents in existence at the time of Jahedi's arrest on December 19, 2008, would have remained in existence. This determination is based on the fact that the FBI was closely monitoring behavior that might lead to destruction, and arrested Jahedi for it. He immediately obtained counsel. The responsible counsel retained would not have condoned or, this Court believes, allowed further destruction. At this point, every move regarding documents was being monitored by multiple individuals.

But further, there was a Protective Order issued in the Assa forfeiture case that also required compliance with preservation obligations.

The Court's confidence that the documents would inevitably have been disclosed is also confirmed, as in <u>Vilar</u>, by the fact that that is precisely what happened. GX 40-48 reflect Claimants' productions in this case. Notably, GX 42 reflects the production of the very documents at issue. Here, as in <u>Vilar</u>, the inevitable disclosure occurred.

Moreover, there has been extensive sharing of documents and coordination between the Government in this case and the cases brought by the Judgment Creditors (in the <u>Kirschenbaum</u> and related actions). That coordination has included deposition coordination and trial coordination. The documents at issue

78

were disclosed without issue by Claimants here to the Judgment Creditors. There is simply no significant possibility that such documents would not have made their way to the Government.

Claimants allege that the Government has, in all events, failed to show with specificity the items that would have been inevitably disclosed. That is incorrect. In fact, such specificity is done relatively easily in this case as they are included in the series of productions contained particularly at GX 42, and more generally at GXs 40-48. The Government need not provide an index of documents that fall within the specific Bates-range indicated in order to have met its obligation. It is enough that the documents can be readily identified, as they can be here.

In sum, the evidentiary record in this case allows the Court to conclude with a very high degree of confidence that the challenged evidence would inevitably have been disclosed in the absence of the search.

IV.     CONCLUSION

For the reasons set forth above, and based on the factual findings made by this Court following an evidentiary hearing, Claimants' motion for suppression is DENIED.

SO ORDERED.

Dated:       New York, New York
             May 15, 2017

_____
         KATHERINE B. FORREST
         United States District Judge